UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 25-13233

ORAL ARGUMENT REQUESTED

JOHN HOUTON

               Plaintiff

v.

MICHELLE WU, ADAM CEDERBAUM, ENEIDA TAVARES,
Commissioner of the Boston Election Department, WILLIAM
GALVIN, Secretary of State, Commonwealth of Massachusetts,
ASHLEY GROFFENBERGER, an individual, COLLECTOR-
TREASURER, CITY OF BOSTON, COMMONWEALTH OF
MASSACHUSETTS, and JOHN DOES Nos. 1-10, Said Names
Being Unknown and Fictitious, as Unknown City of Boston
Employees or Wu Campaign Officials

               Defendants

## VERIFIED COMPLAINT

### PREAMBLE

Plaintiff, John F. Houton, Jr., residing in Boston, Massachusetts, by way of

Complaint, states:

On America's bicentennial anniversary in 1976 the Supreme Court held that "political

belief and association constitute the core of those activities protected by the First

Amendment." Elrod v. Burns, 427 U.S. 347, 356 (1976). As we approach our nation's 250th

anniversary in the coming year, Boston has a mayoral election whereby the City's Charter

unconstitutionally restricts aspiring candidates' access to the ballot while the mayor and her

1

top lawyer choked off the "right of individuals to associate for the advancement of political beliefs" and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively" which are vital "overlapping" rights that "rank among our most precious freedoms."  Williams v. Rhodes, 393 U.S. 23, 30 (1968).

## NATURE OF ACTION

1.      The path usually taken in the United States of America for a candidate's access to the ballot is a signature requirement where a candidate submits nomination sheets filled with the signatures of qualified registered voters who nominate the candidate to appear on the ballot for an election.  This is the process in Massachusetts including the city of Boston. However, in Boston the signature requirement for a candidate for Mayor of Boston is severely burdensome and restrictive when combined with the short time allotted by certain Boston City Charter provisions. The effect of these requirements in Boston demonstrate the Boston election system for mayors appears designed to keep novel and aspiring candidates, bona fide challengers, from the ballot. The election system in Boston is a relic from the "old boss" ward system of a century ago. However, incumbents in our time benefit immensely and use this mechanism to consolidate their control and political power in Boston. The Boston system does not serve the interests of the wider community, the entire voting electorate, and blocks meaningful opportunity for new candidates to emerge and is, therefore, unconstitutional.

2.      This lawsuit presents several constitutional challenges. The first alleges that certain sections of the Boston City Charter, including the signature and filing and submission requirements in §§ 24, 24A, and 25 which unconstitutionally restrict aspiring candidates from getting access to the election ballot for the office of mayor.

3.      Unlike the ballot access requirements that most candidates are required to fulfill across Massachusetts, including the large number (10,000) for statewide candidates,

signature requirements may still reasonably be achieved (over several months) by aspiring candidates because these other election systems are rational. However, in contrast, Boston requires an excessively large number especially when combined with a short time period (21 days) in which to complete and submit one's nomination papers. The §25 (3,000+) signature requirement in the Boston system combined with the time allotted to obtain signatures gives it a patently exclusionary character.

4.     Notwithstanding these provisions of the City Charter, this lawsuit also asserts claims against city officials including Corporation Counsel Adam Cederbaum, formerly Chief of Government Services and Law Department supervisor of Plaintiff; and Mayor Michelle Wu, previously City Councilor At-Large during the 2021 election, and other known and unknown officials who participated in and supported a scheme to defraud the public, and Plaintiff, of honest services, and conspired under color of law to thwart Plaintiff's First Amendment right to become a candidate for office in 2021 and 2025, disabling his candidacy from the start preventing him from timely gathering the required signatures to appear on the ballot.

5.     These defendants also acted under color of law while holding a conflict of interest in order to obtain unwarranted privileges at the expense of the public interest with fraudulent intent while also undermining the fundamental rights of Plaintiff, a public employee, striving to be a candidate for office in two successive mayoral elections (2021, 2025); and the City retaliated against Plaintiff for exercising his First Amendment rights.

6.     These unlawful and ultra vires acts by city officials thwarted and impaired Plaintiff's First Amendment right to associate with voters (organize, pursue, and advance his campaign) and gather the required signatures to timely get access to the ballot and challenge Michelle Wu, an At-Large City Councilor and candidate for mayor in 2021, and incumbent mayor and candidate for reelection in 2025.

7.     These individuals, as officials of the City of Boston, acted under color of law,

3

and the City of Boston itself, violated Plaintiff's rights under the First Amendment of the U.S. Constitution, and further denied Plaintiff's rights protected by the Equal Protection Clause of the Fourteenth Amendment, and committed other violations under federal and state law depriving Plaintiff and the public interest in Boston of a fair election system. The "franchise" in Boston is imperiled!

8.      Though "the Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." Williams v. Rhodes, 393 U.S. at 29.

## PARTIES

9.      At all relevant times, Plaintiff, John Houton ("Candidate Houton" or Plaintiff) resides in Boston, Massachusetts. Central to the issues in this case, Plaintiff is a candidate for the office of Mayor of Boston. Plaintiff is currently employed as an Assistant Corporation Counsel at the City of Boston Law Department serving as in-house counsel to the City's Treasury Department and has been employed with the City for nearly two decades and is entering his 19th year as an attorney and public employee at the City of Boston.

10.      Defendant, William Galvin, is the Secretary of State for the Commonwealth of Massachusetts. Defendant Galvin is sued in his official capacity for declaratory and prospective injunctive relief to rectify and prevent future violations of federal and state constitutional and statutory rights in Boston. Mr. Galvin supervises and controls the department of the state secretary, which administers state and federal elections in the Commonwealth, including the city of Boston. As such he may order, or be ordered by mandamus by this Court, appropriate relief determining that Plaintiff was denied his constitutional rights and therefore is qualified and shall be placed on the ballot as a candidate for the office of Mayor in the General Election in Boston on November 4, 2025.

4

11.     Defendant Eneida Tavares is sued in her official capacity as Commissioner of the Election Department of the City of Boston and, as such, at all relevant times is responsible for printing the election ballot for Boston's general election to be held on November 4, 2025.

12.     Defendant Michelle Wu or  referred to herein as "Mayor Wu" or "Michelle Wu" is sued in both her personal, individual capacity and in her official capacity as Mayor of the City of Boston.

13.     At all relevant times, Defendant Adam Cederbaum or otherwise referred to as "Cederbaum" is sued in his official capacity as Corporation Counsel of the City of Boston Law Department, and also personally in his individual capacity.

14.     At all relevant times, Defendant Ashley Groffenberger, Collector-Treasurer of the City of Boston, is sued in both her personal, individual capacity and in her official capacity as Collector-Treasurer of the City of Boston.

15.     At all relevant times, Defendant Jerica Bradley, First Assistant Collector-Treasurer of the City of Boston, is sued in both her personal, individual capacity and in her official capacity as Collector-Treasurer of the City of Boston.

16.     At all relevant times, Defendant Margaret Dyson, Director of Trusts in the City of Boston Treasury Department, is sued in both her personal, individual capacity and in her official capacity as Director of Trusts of the City of Boston.

17.     At all relevant times, Defendant Maureen Garceau, previously serving as First Assistant Collector-Treasurer of the City of Boston Treasury Department and a contractor for the city, is sued in both her personal, individual capacity and in her official capacity as First Assistant Collector-Treasurer and subsequently as a contractor of the City

5

of Boston.

18. Defendants John Does 1-X are persons, organizations, entities, and/or businesses, whose identities are presently unknown to plaintiff, who are and/or were responsible in some capacity for directing or participating in activities that resulted in fraud, honest services fraud, interference with Plaintiff's contractual rights, his first amendment rights, and Plaintiff's name not be placed on the election ballot for mayor of Boston in the September 9, 2025 preliminary election.

19. Defendants Jane Does 1-X are persons, organizations, entities, and/or businesses, whose identities are presently unknown to plaintiff, who are and/or were responsible in some capacity for directing or participating in activities that resulted in fraud, honest services fraud, interference with Plaintiff's contractual rights, first amendment rights, and Plaintiff's name not being placed on the election ballot for mayor of Boston in the September 9, 2025 preliminary election.

20. John Doe, Jane Doe who are officials and employees, or contractors, appointed or otherwise, of the City of Boston who, upon information and belief, acted knowingly and in concert with Defendant WU to violate Plaintiff's rights as more particularly set forth *infra.* At such time as Plaintiff ascertains with certainty and by means of discovery the actual identities of the individuals with the surname Doe, he will seek leave to serve an amended complaint.

## JURISDICTION AND VENUE

21. Jurisdiction is proper in this Court under 28 U.S.C.A. § 1331, in that this case raises a federal question under the United States Constitution and 42 U.S.C. §1983, as this is an action to vindicate Plaintiff's rights, privileges and immunities as guaranteed him by reason of the First and Fourteenth Amendments to the United States Constitution, for

deprivations by Defendants, acting under color of law and in concert and further Defendants have violated Plaintiff's Right to Equal Protection under the 14th Amendment to the United States Constitution.

22.     This Court has jurisdiction over this civil rights action under 28 U.S.C. § 1331 because it arises under the Constitution of the United States, and under § 1343(a)(3) and (4) because it is an action to redress the deprivation of a right – the right to free expression – secured by the U.S. Constitution, and because it is an action to secure equitable relief under the federal civil rights law, an act of Congress.

23.     This court has personal jurisdiction over the Defendant because it is a municipality located wholly within this federal district.

24.     The Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983.

25.      Supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, also exists over Plaintiffs claim for violation of Article 9 of the Massachusetts Declaration of Rights (Mass. Const. pt. 1, art. 9.).

26.     Venue is proper under 28 U.S.C.A. § 1391(b)(1) and (2) because the Defendant is a municipality located wholly within the district, and a substantial part of the events giving rise to the claims-the adoption of a restriction on plaintiffs' rights – occurred within the District of Massachusetts.

## FACTUAL ALLEGATIONS

27.     Plaintiff John Houton has been a resident of the South End, in Boston, Massachusetts since 2007 and was born and raised in Dorchester and attended St. Williams School in Savin Hill and Catholic Memorial H.S. in West Roxbury. Plaintiff has been an

7

Assistant Corporation Counsel for the City of Boston since October 2007.

28. On May 2, 2025 Plaintiff filed a statement of Candidacy at the Boston Election Department for the Office of Mayor of Boston.

29. Candidate Houton is a public employee and as such relied upon the City's periodic guidance from the Law Department regarding political activity distributed to all city employees during each election cycle.

30. The City of Boston Law Department distributes guidance via email communication to all City employees, which is generally adopted as City of Boston policy. The guidance contains a broad list of prohibitions and restrictions regarding political activity and is entitled "Restrictions on Political Activities by Compensated City Employees." These restrictions are a comprehensive way to regulate the communications, fundraising, and political activities of employees of the City of Boston.

31. On Monday, May 5, 2025 nomination papers became available for Plaintiff, three days after Plaintiff filed his Statement of Candidacy for Mayor of Boston. Candidate Houton picked up his nomination papers at the Election Department in late afternoon shortly before 5:00 pm and received training provided by the Department's Head Assistant Registrar of Voters for the City of Boston Election Department. The training reflected the complex and entangled web of requirements opaquely delineated in the Boston City Charter that a candidate must comply with in order to obtain valid certifiable nomination signatures from qualified registered voters in Boston in order to appear on the ballot. Plaintiff was informed that he was required to obtain a minimum of 3,000 certifiable signatures for his nomination papers to be a qualified candidate for mayor but was advised that more would be necessary, perhaps an additional 1,200 or more signatures in order to ensure a sufficient number of certifiable signatures from qualified registered voters due to expected invalid signatures. Candidate Houton was informed that he had until 4:59 pm May

20th (15 days) to file his nomination papers (at least 100 sheets but probably 150 sheets totaling 3,000 – 4,5000 signatures) with the City of Boston Election Department, a minimum average of 200 signatures per day counting that first day (May 5) at approximately 5:00pm.

32.    Modern day signature gathering is a labor-intensive task. You need people. Close friends and family can provide a level of support to obtain signatures without much cost. When it is signature gathering for offices such as a district city councilor, it requires a mere 200 signatures, a candidate and his family could accomplish this on one weekend. Such a candidate has 20 days to gather 200 signatures which is an average of approximately 10 signatures per day. The meaning of what constitutes a certifiable signature under the City Charter suggests one would need twice that number, so assume 400+ signatures would be sufficient to meet the minimum requirement for a district city councilor.

33.    To get on the ballot in Boston, a mayoral candidate needs 3,000 + certified signatures of qualified registered voters in accordance with §25 of the Boston City Charter. A candidate lacking incumbency, personal wealth or contributions will need multiple days and people (volunteers), perhaps many people over a consistent number of days canvassing for signatures from qualified registered voters. The fewer people one has helping obtain signatures the greater the challenge to obtain the requisite number of signatures. But a candidate may yet still obtain the required signatures by oneself canvassing in the community from person to person, door to door. This requires one essential ingredient: time.

34.    Plaintiff's initial challenge and opportunity as a candidate for mayor was first to get on the ballot: the right that we all have as citizens to participate in the political process. Plaintiff believed in the "right of individuals to associate for the advancement of

political beliefs" and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Rhodes*, at 30. However, Candidate Houton's experience canvassing in Boston's neighborhoods for signatures demonstrated that the Boston City Charter, §24, §24A, and §25, restricts access to the ballot by irrationally denying a reasonable time period for ordinary and aspiring candidates to associate with individuals, share political beliefs, and gather the required signatures to appear on the ballot so qualified voters may cast their votes effectively on September 9, 2025. The irrational and restrictive time period from beginning (April 30th) to end (May 20th) imposed by the City of Boston through its City Charter provisions to achieve 3,000+ signatures, a period of 21 days, violated the constitutional rights of Candidate Houton and also the rights of qualified registered voters who may have wished to associate with his candidacy during his period of canvassing.

35.    Candidate Houton alleges that the 3000+ signature requirement (§25) together with the very limited number of days (§24, §24A) in which to obtain these signatures (21 days or less) is unconstitutional because together they constitute a combined and complete obstacle and barrier for a candidate without wealth, status, or political power or position (incumbency) to get on the ballot.

36.    For a fair and realistic comparison with Boston one need only look around Massachusetts to understand what a rational election system looks like. In Massachusetts, the signature count and timeframe for obtaining signatures in statewide elections for U.S. Senator, Governor, Lieutenant Governor, Attorney General, is 10,000 signatures and 5,000 signatures for candidates aspiring to be the Commonwealth's Treasurer, Auditor, and Secretary. What is interesting and compelling is that potential candidates for each of these offices are allotted a minimum of 85 days, and up to 169 days, to obtain the requisite signatures to get on the ballot. A candidate canvassing in the community knocking on doors

10

could achieve the required number, 10,000 for example, over this time period averaging 118 to 59 signatures per day. The time allotted for these statewide candidates under a state statute is rational and reasonable. However, in Boston in order to achieve the City Charter's 3,000 signature requirement in just 21 days, a candidate would need to average a minimum of 142 signatures per day which is extremely difficult and unlikely.

37.     The comparison between the statewide ballot access requirement and time allotted with that of Boston's system of elections demonstrates the legislature understood a reasonable time for candidates is necessary, especially a novice and aspiring candidate, to walk the neighborhood of the districts he hopes to represent so registered voters may get to know the candidate and decide whether to support his effort and sign his nomination papers. Unfortunately, the Legislature excepted or carved Boston out of the Commonwealth's rational process to allow Boston to establish a patently unfair and undemocratic system through the Boston City Charter, including the most critical elements, i.e., the signature requirement and the timeframe from which to obtain and submit signatures. However, as the Massachusetts Supreme Judicial Court stated: "a person needing signatures for ballot access requires personal contact with voters. He or she cannot reasonably obtain them in any other way." *Batchelder v. Allied Stores International, Inc*., 388 Mass. 83, 92 (1983). Indeed, a person needing signatures for ballot access also needs the time in order to make personal contact with voters. Plaintiff personally did this work and learned by experience that it cannot reasonably be obtained in any other way unless you are an incumbent like Michelle Wu or had the means to coral 400+ supporters like Josh Kraft and few other exceptions. The work is the work and a candidate engaging with voters requires time. Boston's combination of high signature count and short time frame is generally a dead-end street for aspiring candidates.

38.     The 21 days duration allotted (from April 30, 2025 to May 20, 2025) to

11

potential candidates, including Candidate Houton in 2025, for Mayor of Boston pursuant to §§24, 24A,25 of the City Charter, to obtain the required 3000+ signatures is exceedingly restrictive, irrational, and unreasonable and violates the U.S. Constitution including the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, and Article 9 of the Massachusetts Declaration of Rights.

39.     The City of Quincy, Massachusetts bordering Boston to the southeast had a mayoral election in 2023. The signature requirement for mayor in Quincy to get on the ballot is simply 50 qualified registered voters certified by the Board of Registrars.  It is the same for City Councilors.  There is no mayoral election this year but the time allotted to obtain such signatures in 2025 was from May 6, 2025 to July 15, 2025, exactly 70 days which is on average less than one signature per day. In such a time period, 70 days, Plaintiff would need to average only approximately 45 signatures per day to achieve 3,000 in Boston.

40.     The City of Framingham, Massachusetts oversees a mayoral election this year and the city requires a candidate to obtain at least 500 certified signatures from qualified registered voters to appear on the ballot. The time frame allotted in Framingham to obtain such signatures was from May 30, 205 to July 15, 2025 for a total of 46 days which is on average approximately 11 signatures per day. Even 46 days for Boston would provide a more realistic timeframe to obtain 3,000 signatures: on average, 65 per day.

41.     Candidates for Mayor of Springfield, Massachusetts must have 500 signatures on the nomination papers certified to get on the ballot. No information is provided or readily available on the Springfield-ma.gov website indicating the first date of availability of nomination papers. Although, 22NEWS reported that nomination papers had to be filed by June 6, 2023.

42.     The City of Newton, Massachusetts is also electing a mayor in 2025 and has

a preliminary election to be held on September 9, 2025 just like Boston. In order to get on the ballot for the preliminary election, nomination papers became available on May 5, 2025 which required at least 400 certifiable signatures to be filed by July 22, 2025. Newton allotted 78 days, more than two-and-a-half months of total time for potential candidates to obtain the necessary signatures. That's 57 days more than Boston for only 400 signatures to get access to the ballot.

43.    The City of Salem, Massachusetts requires not less than 100 signatures to get access to the ballot for the office of mayor. Nomination papers were able to be picked up on April 1, 2025 and filed by July 29, 2025. Candidates were allotted a total of 119 days to obtain at least 100 certifiable signatures of qualified registered voters in Salem which is on average less than one per day. If Candidate Houton had 119 days in Boston to obtain 3,000 signatures he could achieve this number by averaging 25 signatures per day.

44.    The City of Everett, Massachusetts requires 500 certifiable signatures of registered voters to get on the ballot. Nomination papers were available on May 15, 2025 and had to be filed by August 4, 2025. Candidates in Everett had a total of 81 days to obtain and file 500 certifiable signatures of qualified voters which is on average 6 signatures per day. In Boston, such a timeframe to obtain 3,000 signatures over a period of 81 days would average about 37 per day.

45.    The City of Somerville, Massachusetts requires mayoral candidates to obtain 250 signatures of registered voters to get on the ballot. Nomination papers were available on May 5, 2025 and had to be filed by June 11, 2025. Candidates in Somerville had a total of 37 days to obtain and file 250 certifiable signatures of qualified voters which is on average approximately 7 signatures per day.

46.    The City of Boston, Massachusetts requires mayoral candidates to obtain 3,000 signatures of registered voters to get on the ballot. Nomination papers were available

on April 30, 2025 and had to be filed by May 20, 2025. Candidates in Boston had a total of 21 days to obtain and file 3,000 signatures of qualified voters which is on average approximately 143 signatures per day.

47.     Candidate Houton, without the personal wealth of Josh Kraft nor preexisting community support, nor the support of affluent backers, or the power of incumbency like Mayor Wu with its inherent advantages, still obtained 533 certified signatures over the course of several days of canvassing neighborhoods while using his vacation leave from May 12 – 20, 2025 notwithstanding the stigma attached to his candidacy (placed on "administrative leave" or "suspended" with an ethical cloud over his candidacy and professional reputation) dubiously imposed without right, by the City of Boston.

48.     However, though Candidate Houton was making progress speaking with voters and obtaining signatures, the clock simply ran out on his chance to get on the ballot. Why did the clock run out? Because the Boston City Charter was designed to close the gate on Plaintiff's opportunity. That is the effect of the twenty-day timeframe. It unreasonably and unconstitutionally severely burdens and therefore shuts out candidates and as a result prevents the voices of registered voters from being heard through their association with the candidate forced out. Candidate Houton would have clearly obtained the necessary 3000+ signatures if the City Charter provided even a semblance of a more reasonable time period to file his nomination papers.

49.     The effect of not having sufficient time to collect the required signatures necessary for getting on the ballot had immediate impact on Houton's candidacy. In addition to being excluded from the election ballot Candidate Houton was excluded from community forums for candidates to be introduced to the electorate and to engage with voters on the issues that matter to them and impact Boston's future. An example is the Hyde Park Neighborhood Association's HPNA/The Pride Mayoral Candidate Forum that

took place on June 5, 2025.

50.     On May 26, 2025 Candidate Houton received an invitation by email from Elaine Coveney of HPNA to participate in the forum. Candidate Houton replied on May 28 thanking Ms. Coveney for the invitation stating he looked forward to participation in the forum.  A short while later on the 28th Ms. Coveney replied that she was glad Candidate Houton was able to participate and that details would follow.

51.     On June 2, 2025 Candidate Houton received another email from Ms. Coveney of the HPNA withdrawing the invitation to participate in the mayoral candidate forum because the City removed Candidate Houton from the qualified list of candidates to appear on the ballot for September's preliminary election. The City Charter's provisions, including §§24-25, have a demonstrable impact on viable candidates from ever getting access to the ballot simply because of the time restriction. The election system described in the Boston City Charter is designed by purpose to prevent candidates from having real access to the ballot which in turn prevents candidates from engaging with and associating with voters who may share similar views and interests for the future of Boston. HPNA's withdrawal of the invitation first given to Candidate Houton is a direct result of the unconstitutional restrictions contained in the Boston City Charter described in this Complaint.

52.     Looking at the Boston election system through an antitrust lens it is difficult not to find that the Boston election system is in fact anticompetitive. In the United States, indeed, in the free world, access to the ballot is the gateway for the entry of competing ideas brought forward to the electorate which is the marketplace, the public commons, where voters may consider candidates' views and competing positions on the issues.

53.     The Boston system is antithetical to the competitive American system of choice.  "The idea that one group can be granted greater voting strength than another is

hostile to the one man, one vote basis of our representative government" *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) The group that gets through the gate does not represent those whose voices were prevented from entering the gate and hidden from the electorate who will never hear their voices nor where they stand on the issues.

54.     In Boston, it's not necessarily the requirement of 3,000 signatures that constitutes a barrier. Rather, the barrier is the requirement that 3,000 signatures must be obtained in a mere 21 days.

55.     Candidate Houton canvassed the neighborhoods of Boston by himself and one other primary volunteer working together.

56.     Candidate Houton and registered voters in Boston were denied a fair competition to have their voices included because the timeframe described in Boston's City Charter to achieve 3,000 signatures of qualified registered voters prevented Candidate Houton from making enough "personal contact with voters," to associate with them for the advancement of shared political beliefs, to achieve 3,000+ signatures and get on the ballot.

57.     Candidate Houton was blocked by an undemocratic and unreasonable deadline established by the City of Boston, not the Commonwealth of Massachusetts, in violation of Plaintiff's fundament rights under the United States Constitution including the First Amendment because of the severe burden that the Boston election system places on the right of association and on the right of voters to effectively express their political preferences in having a voice as espoused by Candidate Houton in the mayoral election in Boston. For all the same reasons Plaintiff's rights were as well violated under Article 9 of the Massachusetts Declaration of Rights.

**CANDIDATE HOUTON  FILES STATEMENT OF CANDIDACY IN 2025**

**AND FACES RETALIATION FROM CITY OF BOSTON, ADAM**

**CEDERBAUM, AND MICHELLE WU**

16

58.     Candidate Houton filed a Statement of Candidacy for mayor of Boston on May 2, 2025.  On May 3, 2025 Candidate Houton received an email from a reporter at the CommonWealth BEACON, a nonprofit news outlet covering politics and policy. The reporter, Gin Dumcius, wanted to learn more about Candidate Houton's potential candidacy since Dumcius has covered several Boston Mayoral races over the years. Candidate Houton spoke with Dumcius on May 5th answering the reporter's questions.  An article later appeared online on Wednesday afternoon, May 7, 2025 at https://commonwealthbeacon.org with the title:

**"Wu challenger emerges from inside Boston City Hall – Longtime city attorney throws his hat into ring," by Gintautas Dumcius.**

55.     On the morning of May 9, 2025, less than 48 hours after publication of the CommonWealth BEACON article about Houton's candidacy, Plaintiff received an email from Adam Cederbaum, Corporation Counsel, Houton's department head of the Law Department at the City of Boston. Cederbaum requested Plaintiff's attendance at a meeting in the Law Department later that afternoon at approximately 3:30 pm. Plaintiff replied that he would attend the meeting.

56.     Plaintiff attended the meeting on the afternoon of May 9th at the Law Department in Boston City Hall in a conference room with Corporation Counsel Cederbaum and Andrea Hennelly, Director of Employee Relations from the City's People Operations Cabinet.

57.     At the meeting, Corporation Counsel Cederbaum told Plaintiff that he was surprised and disappointed to learn from a news article that Plaintiff was a candidate for Mayor, and that he had concerns about Plaintiff's ethical obligations to " serve our client." Plaintiff was placed on paid administrative leave effective immediately while an investigation would ensue with Cederbaum procuring outside counsel to investigate the

17

matter. There was no indication how long Plaintiff's administrative leave would last nor the impact such action would have on Candidate Houton campaign. Plaintiff expressed concern, however, of the impact of Cederbaum's action on his ability to get on the ballot. Plaintiff was handed a letter from Cederbaum essentially restating the reasons for Plaintiff's suspension. (See letter from Cederbaum to John Houton dated May 9, 2025.)

58.     Plaintiff, however, informed Corporation Counsel that he had previously submitted vacation leave for seven days so that Candidate Houton could use such leave to obtain the signatures he needed in order to get on the ballot. In response, and oddly, Corporation Counsel Cederbaum stated that nobody else in the City is aware of Plaintiff's administrative leave (suspension) status and this would remain so. (This was odd in the sense that Plaintiff was a candidate for office yet he appeared to expect Plaintiff not to disclose the fact he was suspended). Corporation Counsel and Ms. Hennelly stated that Plaintiff could still use his vacation leave as he planned but that for the purposes of their investigation of this matter (ethical issues; conflict of interest) Plaintiff would have the status of being on paid administrative leave.

59.     The terms of the Plaintiff's suspension and removal from his job as in-house counsel in the Treasury Department were otherwise unclear except that Plaintiff was suspended (with paid leave) while the City investigated Houton's candidacy for Mayor. Plaintiff stated that the City placing him on leave surprised Plaintiff because other city employees are running for office including another employee running for mayor. Indeed, public employees around the Commonwealth of Massachusetts, have run for office routinely over the years.

60.     In fact, Mayor Wu herself has encouraged other City employees to run for office as recently as the last election in 2023 for City Council, including John FitzGerald, at the time was an employee of the Planning and Development Agency, who succeeded and

currently represents District 3 on the City Council and will be running unopposed in the general election in November 2025.

61.     Enrique Pepén, was Executive Director of the City's Department of Neighborhood Services, who also was a candidate supported by Mayor Wu in 2023. He is currently a City Councilor running for reelection for District 5 on the Boston City Council.

62.     Both Pepen and Fitzgerald, candidates for re-election in this cycle, are former city employees who ran for office and, unlike city employee Houton, were not punished and stymied by the Wu administration. Quite the opposite, they received the encouragement and support of the mayor.

63.     In addition, and even more confusing, the Mayor is currently supporting the candidacy of another City employee in this 2025 election cycle for the City Council. Alexandra Valdez, Mayor Wu's executive director of Boston's Office of Cultural Affairs, is a candidate on the ballot running for city councilor at-large for the Boston City Council.

64.     Mayor Wu has supported another executive level employee running for City Council, Henry Santana, in 2023. He "served as the inaugural director for Mayor Michelle Wu's Office of Civic Organizing" according to the City Council page on Boston.gov and received the help and support of the Mayor and was elected in 2023.

65.     Startlingly, in the spring of 2025, it appeared incumbent Councilor Santana was having difficulty obtaining signatures to get on the ballot for this September's election, according to the stellar reporting of the Boston Herald's Gayla Cawley. (See ¶67 below).

66.     Councilor Santana, who was facing the same time deadline as Candidate Houton was trying to meet as a mayoral candidate, benefited from the cavalry call made by Mayor Wu to her supporters.

67.     In fact, Mayor Wu used her political infrastructure, upon information and belief, including city resources, to get the call out to the public by news publications as well

as an email list to her supporters. As a candidate for At-Large City Councilor, Santana

needed a total of 1500 signatures, as opposed to Candidate Houton's 3,000, by May 20th. It

was Friday May 17, 2025 and the mayor's handpicked preferred candidate from 2023 was

in danger of not getting on the ballot in Boston in 2025, his first reelection opportunity.

68.     The Herald's Cawley reported:

"Boston Mayor Michelle Wu is mobilizing her campaign in an 'all hands
on deck' effort to get Henry Santana, one of her preferred City Council
candidates, on the ballot ahead of Tuesday's deadline." Cawley further
noted that Santana was the only at-large incumbent to have not completed
his signature forms."

The article is titled: "Boston Mayor Wu launches campaign effort to get
her preferred city councilor on ballot" and a photo appears below the title
with Wu and Santana smiling and laughing apparently on July 20, 2023 in
front of a crowd of supporters holding Henry Santana signs. Below the
photo a caption states, among other things, that "the Mayor and several
city councilors and union endorse Henry Santana for City Councilor at
Large…"

With the deadline to file nomination papers "fast approaching, Mayor Wu
is described as "launching" or galvanizing her supporters to get engaged
to help Henry Santana get on the ballot again.

(See attached Article by Gayla Cawley, Boston Herald, May 17, 2025)

69.     Finally, another career city employee, Will Onuoha, an attorney, is currently

running for City Council At-Large in this election. Mr. Onuoha is an Assistant General

Counsel at the Boston Water and Sewer Commission. In fact, while I've been employed at

the Treasury Department Mr. Onuoha worked at the city in various capacities including

Executive Director of the Office of Civil Rights and as Deputy Commissioner of Housing

at the Inspectional Services Department.

70.     A fact that must be noted is the difference between the Houton candidacy and

these other city employees. Plaintiff is running for the office of mayor which means

running against Michelle Wu whereas most of these city employees running for office are

aligned with and have the support of Michelle Wu and her administration. Candidate Houton offers a different and responsible path for the city focusing on getting Boston "back to basics" and doing the necessary things to keep the city running as a prosperous vibrant City for all. The City's residents who met Candidate Houton appreciate his alternative vision for leading the City forward.

71.     Placing Plaintiff on suspension shortly after he filed his statement of candidacy unduly impinges upon Plaintiff's rights guaranteed by the Fourteenth Amendment. Cederbaum's and Wu's actions were not based on any findings or established precedent but were contrary to the City's own policy on political activity and contrary to the Wu administration's concurrent actions with other city employees engaged as candidate for office in Boston.  The placing of Plaintiff on leave has essentially ended his career at the city, ruined his professional reputation and amount to the constructive dismissal of Plaintiff from his job while imperiled his candidacy for mayor of Boston.

72.     The City's action is entirely arbitrary and the limitation placed on Candidate Houton, i.e., his administrative leave status, maligned his profile as a candidate and undermined his ability to develop an effective organization to get on the ballot, and run a campaign for mayor. This act by the City was disabling, as it created an unwarranted and unjustified barrier to getting on the ballot. Indeed, without any findings and in the limited time available for Candidate Houton to get on the election ballot the City callously and capriciously ignored Plaintiff's constitutional rights, and considered no alternatives for Plaintiff to remain as counsel and have no stigma attached to his candidacy. In fact, this was the outcome sought by the city: destroy any potential candidacy for Plaintiff.

73.     Simply put, the City through the actions of Cederbaum and Wu denied and ignored Plaintiff's constitutional rights and crippled his efforts to get on the ballot by inducing fear of economic harm, by making false and misleading statements to the media to

defame Candidate Houton in the view of the electorate whose signatures Candidate Houton

needed to get on the ballot.

74.     The City was acting as a gatekeeper for the mayoral election in Boston

keeping Candidate Houton from ever getting off the ground, doing everything it could to

prevent Plaintiff from having access to the ballot. These actions by the City of Boston

constitute a prior restraint on Houton's fundamental free speech rights using governmental

control over his employment as a means to achieve the greatest prior restraint possible on

Houton's candidacy; Once the Wu administration became aware of Houton's candidacy

when the CommonwealthBEACON first published online on May 7th, the City reacted two

days later on May 9 by removing plaintiff from his job, and subsequently injuring his

reputation professionally by facilitating the publication on May 13, 2025 of false,

defamatory statements implying partisan wrongdoing and unprofessional conduct by

Plaintiff as a "staff attorney" which is not, in fact, the job title of Plaintiff; all implying

Plaintiff himself was placed on leave due to ethical reasons suggesting he was a partisan

attorney which would hurt his candidacy, and hurt his reputation.

75.     By placing Plaintiff on administrative leave and making false and defamatory

statements painting him as a partisan staff attorney rather than the professional, experienced

Assistant Corporation Counsel he has been for nearly twenty years over four

administrations, the City sought to restrain Plaintiff's voice (violated his 1st Amendment

free speech rights), retaliated and destroyed any chance Candidate Houton could get on the

ballot. Plaintiff had told Cederbaum in the May 9th meeting in which he was summarily

placed on leave that he had already put in vacation leave for the period remaining to get on

the ballot. Nonetheless, the city maliciously suspended Plaintiff because it was their intent

to thwart Plaintiff's candidacy. The City of Boston through the actions of Cederbaum and

Wu sought to prevent Candidate Houton's ideas from being heard, considered, debated or

accepted by the electorate. The worked suddenly and struck a harsh blow to stifle Houton's free expression. The people of Boston would never get to hear the ideas and responses from Candidate Houton. This is the classic effect of a prior restraint on speech instituted by government.

76.    Candidate Houton sought to utilize his knowledge and experience to improve conditions in the city of Boston for its residents by becoming a candidate for mayor and enter the marketplace of ideas about Boston's future. The city acted against Plaintiff thus preventing him from speaking about matters of public concern. Immediately upon becoming a candidate the city tried to close the gate on Plaintiff's opportunity to enter the fray and speak freely without fear of being punished.

77.    The city's actions against Plaintiff substantially impaired the associational rights of Candidate Houton and voters who may wish to share interests and ideas for the betterment of Boston and compete in the "marketplace of ideas" after Candidate Houton would get on the ballot.

78.    The City's justification of placing Plaintiff on leave because he is an Assistant Corporation Counsel was unnecessary and disingenuous. This action was not needed to protect the City's interest in high standards of legal ethics. In fact, it was done solely to undermine Plaintiff's participation in the electoral process.

**The 2021 Mayoral Election**

79.    The 2025 mayoral election was not the first attempt at being a candidate for Plaintiff. His meeting with Cederbaum on May 9, 2025 was not the first meeting Plaintiff had with Cederbaum regarding his candidacy.  Cederbaum claiming surprise in the May 9, 2025 meeting, and letter to Plaintiff, suspending him, is false. In fact, before Michelle Wu became Mayor of Boston in November 2021, Plaintiff, an Assistant Corporation Counsel for the City of Boston for nearly 15 years in April 2021 was an aspiring and potential

23

candidate with equal right to run for the office of mayor as City Councilor Michelle Wu or any other candidate who wanted to present a plan for Boston's future.

80.    Before Michelle Wu appointed Adam Cederbaum as Corporation Counsel he was Chief of Government Services, and Plaintiff's Law Department supervisor. It was in the spring of 2021 that Plaintiff decided to become a candidate for mayor and compete against all others who were candidates, mainly current Boston city councilors, one of which was an acting mayor, in addition to a recently resigned city department head, John Barros, appointed by former mayor Marty Walsh.

81.    In connection with his desire to run for political office, and before filing his statement of candidacy, on April 12, 2021 Plaintiff emailed Cederbaum and requested to meet with him. Plaintiff wanted to disclose to his supervisor that Plaintiff intended to run for Mayor of Boston. Plaintiff also wanted to understand and establish all appropriate protocols so as to remain on the job as counsel in the Treasury and campaign after hours.

82.    Cederbaum responded by email the next morning April 13, 2021 agreeing that he was available to meet. Plaintiff and Cederbaum met later that morning on City Hall Plaza. Plaintiff disclosed to Cederbaum that he was going to file papers to run for mayor and would stay on the job while campaigning. Defendant Cederbaum did not offer any instruction or any guidance to Plaintiff about establishing appropriate protocols at work nor did he state he would discuss it with Henry Luthin, Corporation Counsel, or follow-up with Plaintiff on a process for dealing with Plaintiff as a candidate for the office of mayor. At this meeting, Cederbaum avoided any detailed discussion about Houton's candidacy or his job status going forward even when Plaintiff asked if his job was secure.

83.    Several days later Plaintiff was walking home on West Brookline Street in the South End and encountered Cederbaum who also lives in the neighborhood. Plaintiff seized on the opportunity to continue the discussion about his candidacy especially his job

status and that time was of the essence for filing his statement of candidacy. Plaintiff had delayed filing on April 13th after his first meeting with Cederbaum because important issues remained unresolved before he would file. Plaintiff spoke plainly and asked Cederbaum if his job was in jeopardy if he filed his candidacy. What will Henry Luthin do? Plaintiff asked this question because logically, by this point, Cederbaum had to have surely discussed our previous conversation with Corporation Counsel. Cederbaum repeated the same behavior from days earlier. He said he didn't know, it was possible, and generally he left Plaintiff uncertain about the Law Department's disposition on his filing papers. Cederbaum was simply evasive and reticent rather than giving any clear guidance to Plaintiff, his direct subordinate in the Law Department.

84. After speaking with Cederbaum the second time in April 2021 Plaintiff concluded from Cederbaum's responses that his job was likely in jeopardy should he go forward as a candidate. Cederbaum was intentionally evasive in response to Plaintiff's direct questions about his job.

85. After speaking with Cederbaum Plaintiff struggled with his decision and further delayed filing any papers at the Election Department in City Hall. Plaintiff was concerned about his job and supporting his family if he was terminated because he ran for office. Without any follow up from Cederbaum, and notwithstanding his odd behavior and response, Plaintiff still hoped to run for mayor.

86. Plaintiff decided to go above Cederbaum since time was of the essence to obtain a definitive answer from the Law Department. On or about April 22, 2021 Plaintiff phoned Corporation Counsel Henry Luthin to inform him of his intent to file his candidacy and obtain guidance, instruction, as appropriate.

87. Plaintiff called Corporation Counsel Henry Luthin at his Law Department number. Corporation Counsel Luthin took the call. Plaintiff stated that he intended to run

for mayor in the open race and run against the City Councilors. Corporation Counsel Luthin was basically speechless, mumbled some unintelligible words and offered no meaningful response, no parameters, no guidance and no prohibition. Plaintiff was befuddled to not have any substance discussed whatsoever raised for him to respond to, no meeting arranged, or otherwise consider and guide him going forward. In addition, no follow-up ever came from the law department. [Nothing was ever said again from anyone associated with the Law Department until the May 9, 2025 meeting in the Law Department with Michelle Wu's Corporation Counsel Adam Cederbaum placing Plaintiff on leave because he filed his Statement of Candidacy for Mayor of Boston.]

88.    In April 2021, no responsible disposition came from the Law Department. Notwithstanding the Law Department's neglect, Plaintiff felt compelled and had the courage to move forward under this uncertainty and risk and on or about April 28, 2021 Plaintiff filed his Statement of Candidacy to run for the office of Mayor of Boston.

89.    On May 11, 2021, the filing deadline for candidates running for office, Candidate Houton was contacted by a Boston Globe reporter, Meghan Irons:

90.    Irons wrote the following by email:

"Good afternoon – Meghan Irons here from the Boston Globe. We are naming all the people who pulled papers for mayor and trying to give our readers a little information on each. Can you please tell us your age and occupation? I'll need that information today, as the story will appear in the morning.
Thank you"

91.    2021 Candidate Houton replied:

Hi Meghan,

**I'm running for mayor of Boston as a current city employee** and I'm bringing our U.S. Constitution with me to ensure that all voices of the people of this city are heard and respected in matters of public concern. Many of these voices are ignored by the other candidates and my voice will make sure they will be heard.

**I'm proud of Boston, its history and its importance to our great country.** I will defend the city and its people every day of my life, and hope to make the people of

Boston proud of their next mayor, a true son of Boston (Dorchester). I have the credentials to do it with unmatched education and experience to lead our city safely and securely to greater prosperity.

**Please connect with me on LinkedIn.**

Thank you!

Meghan, **I am an attorney**.

92.     Candidate Houton received no email reply from Meghan Irons. It was Irons who emailed Candidate Houton. In fact, she did not do what she stated that the Boston Globe would do in her email. The Boston Globe did not even mention Plaintiff as a candidate. This is demonstrative evidence how the media, and the Boston Globe specifically, works with those who they wish to present as a candidate rather than present objective facts to the public. Michelle Wu and all the other women candidates from the City Council and their race were what was the focus of the Boston Globe. The Boston Globe had an agenda and pushed it on the electorate.

93.     An experienced City of Boston attorney for some reason did not fit the Boston Globe's narrative that it was advancing in 2021. Plaintiff alleges there was communication between City Hall personnel and the Boston Globe. Discovering the truth about the media interactions with City Hall will shed additional light into the actions of government officials during the spring and summer of 2021, a time of transition in the city in 2021.

94.     Irons was the Boston Globe's City Hall Bureau Chief. Plaintiff alleges Irons and or another reporter of the Boston Globe discussed or otherwise communicated with City Hall officials regarding the Houton candidacy and other in the spring of 2021 and this influenced the Boston Globe not to report anything about the Houton Candidacy.

95.     In terms of experience in city government, Candidate Houton's knowledge and experience as an Assistant Corporation Counsel in Boston City Hall exceeded that of

all other candidates running for mayor. In addition, Candidate Houton was born and raised in Dorchester, went to parochial schools and has much to offer in leading the city forward. Plaintiff was eager to engage with the residents of Boston in 2021 but the Boston Globe ignored candidate Houton's qualifications as a candidate.

96.     The title of the Globe article  about the candidates was as follows:

"***Boston fields historically diverse crop of mayoral candidates; all top candidates identify as people of color***" Boston Globe, May 11, 2021

97.     How the Globe editors determine "top candidates" can only be inferred from the article which shed light on candidates' qualifications and experience in government or otherwise. Plaintiff met all objective qualifications and should have fairly been presented as qualified by any reasonable journalistic standard. However, readers, including some who are part of the presumed electorate in Boston did not learn of Candidate Houton in April 2021. Many did, however, submit critical comments which speak for themselves regarding the Boston Globe's chosen field of top candidates. It highlights how, even in today's era of social media presence, a general circulation newspaper retains extraordinary power in today's media to publish, inform or deceive, and thereby shape opinion which should not go unnoticed by this court. See the article:

https://www.bostonglobe.com/2021/05/11/metro/boston-fields-historically-diverse-crop-mayoral-candidates-all-top-candidates-identify-people-color/

98.     Meghan Irons and the Boston Globe requested information from Candidate Houton on May 11, 2021 but upon information and belief withheld the information provided by Candidate Houton from publication including that Plaintiff was a senior attorney employed at Boston City Hall which Irons was the bureau chief overseeing Boston City Hall for the Boston Globe. Did the Boston Globe withhold such information from the

public in order to protect Michelle Wu or other candidates? Plaintiff alleges that is the case and communications between persons associated with the newspaper and city officials will reveal the same.

99.    Candidate Houton did not get on the ballot in 2021. Plaintiff alleges that the timeframe allotted by the City Charter, 21 days in 2021, prohibited him from obtaining the necessary signatures to appear on the ballot in a timely manner. In addition, plaintiff alleges that the delay caused by his Law Department supervisors in failing to address his status as a potential candidate had handicapped his candidacy by Cederbaum's use of implied threats to his job by making it appear a strong possibility that he would be terminated if he advanced with his candidacy, thus Plaintiff delayed organizing and filing his statement of candidacy. The uncertainty surrounding his job status prevented Plaintiff from filing on April 13, 2021, 15 days earlier than he actually did, April 28, 2021. The only reason he did not file on or around the 13th was as a result of the actions of his Law Department supervisor, Defendant Cederbaum.

100.   In 2021, the candidate field for Mayor included City Councilors Michelle Wu, Annissa Essaibi George, and Andrea Campbell, and acting Mayor Kim Janey, as well as John Barros, a City employee/appointee/department head for former mayor Marty Walsh, Jon Santiago, a State Representative, Robert Cappucci, and Richard Spagnuolo. It was a wide-open field but, as usual, incumbents dominated both the preliminary and general elections. Finalists Wu and Essaibi George advanced from September's preliminary election to face each other in the general election on November 2, 2021, which Wu won handily.

101.   After the election, on November 18, 2021, and to Plaintiff's great surprise, Mayor elect Wu named Adam Cederbaum Corporation Counsel. Suddenly, Corporation Counsel Luthin was subordinate to Cederbaum, a mere supervisor in the Law Department.

Henry Luthin was retained and appointed senior counsel and remained in the Law Department until his retirement in May 2023. In her statement to the public naming Adam Cederbaum Wu stated: "I'm grateful to appoint this longtime friend and colleague…as our next Corporation Counsel."

**POST-ELECTION RETALIATION**

**BY CEDERBAUM AND TREASURY DEPARTMENT**

102.   Not long after the start of the Wu administration, certain changes in Plaintiff's working conditions arose which accumulated over time, and constitute retaliation against Plaintiff for his 2021 candidacy.

103.   Plaintiff had a right to be a candidate in 2021 and seek office unimpaired from interference or threats to his job from his supervisor, Defendant Cederbaum. After disclosing his interest consistent with his professional responsibility as an attorney, Plaintiff sought appropriate guidance from his supervisors in the Law Department. However, the fact that Cederbaum did not disclose his relationship with Michelle Wu, the leading candidate in the election in which Plaintiff was entering as a candidate for mayor and for which Plaintiff requested a meeting to discuss with Defendant Cederbaum, constitutes fraud, honest services fraud, violation of Cederbaum's fiduciary duty and professional responsibility as a managing attorney.

104.   The incalculable harm to plaintiff and his candidacy is extraordinary as it harmed his First Amendment right to seek office; violated his rights under Article 9 of the Massachusetts Declaration of Rights. Houton's potential candidacy was nipped in the bud as Plaintiff's determination on proceeding was, materially, dependent upon the guidance that Plaintiff sought from his supervisors in the Law Department. The fact that that

guidance was denied or withheld because his supervisors had a hidden interest suggests and exposes fraudulent intent by the individuals involved as City of Boston officials who would somehow benefit from not providing the guidance Plaintiff sought.

105.   It was not until Adam Cederbaum's appointment as Corporation Counsel by Mayor Wu on November 18, 2021, did Plaintiff realize that Cederbaum had not been honest and transparent during his meetings with Plaintiff in April 2021. Cederbaum had an actual conflict of interest which he kept hidden when meeting with Plaintiff and discussed Plaintiff's fledgling candidacy. At that time Cederbaum was Plaintiff's Law Department supervisor from whom Plaintiff appropriately sought professional supervisory guidance about what steps to take in connection with Plaintiff's desire to run for political office while employed as counsel.

106.   Cederbaum in April 2021 was in fact wearing two hats, one as Chief of Government Services in the Law Department and the other as an "inside agent" at City Hall for candidate for mayor, Michelle Wu.

107.   The Massachusetts conflict of interest law applicable to municipal employees imposed a duty on Cederbaum to disclose the fact that he had a conflict of interest and withdraw from our meeting once he was aware of the subject matter: Plaintiff's status as a potential candidate for mayor.

108.   Cederbaum had an interest in the outcome of the election because City Councilor Michelle Wu, if she won the election, would appoint Cederbaum as her Corporation Counsel. Cederbaum would be the chief counsel of the city something he otherwise would not likely achieve, and his career at the City would likely remain static should a different candidate win. Plaintiff's candidacy had the potential of altering Cederbaum's future from the one Wu's election offered.

109.   Compliance with the Conflict of Interest law required Cederbaum to disclose

and recuse himself from any further discussion and refer Plaintiff to ethics counsel in the Law Department or another manager. However, Cederbaum proceeded with the meeting despite his conflict and took deliberate steps to confuse and intimidate Plaintiff with the threat of Plaintiff losing his job.

110.    Recall, mayor elect Wu appointed Cederbaum Corporation Counsel on November 18, 2021. If Cederbaum had disclosed this possibility to Plaintiff in April 2021 when they met Plaintiff would have thanked him for disclosing that fact, concluded the meeting, and proceeded to immediately organize his campaign for mayor without delay. Instead, Cederbaum hid his conflict and induced fear of economic harm on Plaintiff by indirectly threatening the loss of his job if he ran for mayor. Both Cederbaum and Wu benefited from his wrongful actions which acted as a drag on Plaintiff's momentum to filing his statement of candidacy in the Election Department. The reality was that along with the delay of Plaintiff's filing his candidacy came compounding problems as every day that passes Plaintiff's availability of opportunity diminished and Wu's candidacy strengthened. That appears to be exactly what Defendant Cederbaum wanted.

111.    As a municipal employee Cederbaum had a duty specifically under M.G.L. c. 268A, §19 to disclose to Plaintiff, and the City itself, that he could not give Plaintiff the guidance he was seeking because he in fact had a financial interest in the matter being discussed with Plaintiff in connection with the 2021 mayoral election.

112.    By not disclosing his conflict while intentionally implying that Plaintiff may be terminated if he pursued his candidacy, Cederbaum's actions were wrongful, ultra vires, and induced fear of economic harm on Plaintiff in pursuit of his First Amendment constitutional right to run for office.

113.    Cederbaum's actions deterred Plaintiff from immediately announcing publicly as a candidate and filing his statement of candidacy on or about April 13, 2021.

Cederbaum's actions negatively impacted and deterred Plaintiff's candidacy for the 2021 election waiting a full 15 additional days until finally filing papers on or about April 28, 2021.

114.   Chapter 268A, §19 prohibits a municipal employee from participating in a particular matter in which such employee has a financial interest (Cederbaum had an interest in being appointed as Corporation Counsel). Upon winning the mayoral election in November 2021, Michelle Wu appointed Cederbaum as Corporation Counsel on November 18, 2021 to oversee the Law Department which demonstrates his close relationship with candidate Michelle Wu over many years and, for the purposes of this lawsuit, particularly during the spring of 2021 when Cederbaum and Plaintiff met and discussed the election and his job as Assistant Corporation Counsel. Cederbaum deprived Plaintiff of the honest services he rightly expected while Cederbaum acted with fraudulent intent.

115.   M.G.L. c. 268A, § 23 (b) (2) (ii) of the Conflict of Interest Law in Massachusetts prohibits a municipal employee such as Cederbaum from using his position to secure for himself or others unwarranted privileges of substantial value and which are not available to others similarly situated. In the context of engaging with Plaintiff in discussing Plaintiff's disclosure that he will run for the office of mayor Cederbaum misused the benefits, privileges or advantages of his office for personal gain for himself and for Michelle Wu.

116.   An officer or employee of a municipal agency obtaining an unwarranted privilege with fraudulent intent violates § 23 (b) (2) (ii) and presents a very serious offense against the public interest as well as harmful to Plaintiff's constitutional rights to be a candidate for office and treated fairly and equally as other public employees similarly situated in Massachusetts. Cederbaum fraudulently impaired Plaintiff's constitutional right to be a candidate so that he could obtain an unwarranted privilege at Plaintiff's and the

public's expense.

117.    In 2021, Candidate Wu, a municipal employee as a City Councilor and subject to the Conflict of Interest Law obtained an unwarranted privilege by having Cederbaum impair, block, and delay Houton's candidacy, namely that she benefited from Cederbaum's unlawful actions violating Plaintiff's constitutional rights and the Conflict of Interest laws of Massachusetts and other federal or state laws herein mentioned.

118.    In 2025, Corporation Counsel Cederbaum continued this scheme to impair, block, and delay Houton's 2025 candidacy by suspending him on administrative leave on May 9, 2025. Candidate Houton had every right to pursue public office in 2025 without impairment of his constitutional rights. Cederbaum again misused his office to take an unwarranted privilege to politically damage Plaintiff who was attempting to get on the ballot for the preliminary election on September 9, 2025. By his action on May 9 Cederbaum violated Plaintiff's First Amendment rights and Plaintiff's Fourteenth Amendment right to equal protection under the U.S. Constitution, and Article 9 of the Massachusetts Declaration of Rights.

119.    Cederbaum misused the benefits, privileges or advantages of his office for personal gain for himself and for Michelle Wu by placing Plaintiff on administrative leave on May 9, 2025, and facilitating the publication of a defamatory statement which implied that Candidate Houton had an ethical or other conflict of interest as a public employee attorney serving the City of Boston simply because he sought to exercise his First Amendment rights to be a candidate in the 2025 election.

120.    Plaintiff had previously followed the published guidance from the Law Department to seek such further guidance for questions related to political activity, i.e. city employee being a candidate in the 2021 election. Plaintiff went to his supervisor appropriately and consistent with such guidance and with the rules of professional conduct

34

for an attorney in Massachusetts.

121.   Certain unknown officials in the City of Boston, whether in the Law Department or otherwise, communicated with the Boston Globe regarding Plaintiff and his potential candidacy. Upon information and belief such communication made by said officials was intended to thwart any advancement of the Houton candidacy in 2021. This was a scheme to defraud the public interest by thwarting or undermining Candidate Houton's legitimate right to run for office in Massachusetts.

122.   As a result of his meeting with Cederbaum and subsequently filing his Statement of Candidacy in 2021 Plaintiff has suffered political retaliation at work. Duties and responsibilities have been taken away, reassigned to non-lawyers. Maureen Garceau, Jerica Bradley and Margaret Dyson as well as Adam Cederbaum have acted to undermine and interfere with Houton's responsibilities, conditions, and terms of his employment. A hostile environment exists directly as a result of their actions which are intentional. Each one is a participant in a conspiracy to violate Plaintiff's constitutional rights. There may be other unknown co-conspirators at City Hall who have played a part in this conspiracy.

## 2025 Election First Amendment and Equal Protection Violations

123.   In 2025, Corporation Counsel Cederbaum continued this scheme to impair, block, and delay Houton's 2025 candidacy by placing him on administrative leave on May 9, 2025. Candidate Houton had every right to pursue public office in 2025 without impairment of his constitutional rights. Cederbaum again misused his office to take an unwarranted privilege to politically damage Plaintiff who was attempting to get on the ballot for the preliminary election on September 9, 2025. By his action on May 9 Cederbaum violated Plaintiff's First Amendment rights and Plaintiff's Fourteenth Amendment right to equal protection under the U.S. Constitution, and Article 9 of the Massachusetts Declaration of Rights.

124.    Cederbaum misused the benefits, privileges or advantages of his office for personal gain for himself and for Michelle Wu by placing Plaintiff on administrative leave on May 9, 2025, and facilitating the publication of defamatory statements which implied that Candidate Houton had an ethical or other conflict of interest as a public employee attorney serving the City of Boston simply because he sought to exercise his First Amendment rights to be a candidate in the 2025 election.

125.    In fact, when the City suspended Plaintiff on May 9, 2025, he was already scheduled for his own use of vacation leave so that he could spend his own time to achieve his objective of obtaining the required signatures to get on the ballot by the May 20th deadline. This was at a critical time, a brief window, for Candidate Houton to meet and associate himself with voters and garner their support.

126.    The City's act of suspending Plaintiff was unlawful as it was discriminatory and retaliatory, intended to continue Cederbaum's conspiracy to undermine Plaintiff's constitutional rights. All these actions described in this Complaint were intentional in order to deprive the public of honest services and to harm Plaintiff in his job as counsel, and to unlawfully impinge upon his constitutional right to run for office. Such actions were malicious though couched in a clever ruse creating a false issue of attorney professional responsibility suggesting Plaintiff had a conflict of interest. Cederbaum's and Wu's underlying motive remained to impede and weaken Candidate Houton's effort and ability to achieve his goal of getting on the ballot for the September 9, 2025 preliminary election while other public employees had free reign to pursue various offices unimpaired and with support of the mayor and her team.

127.    The City's action, on May 9, 2025 through its officials, in placing Plaintiff on leave and suggesting fault onto Plaintiff, that he had done something wrong and deserved to be removed from his job and placed on administrative leave, was an intentional act to strike

Houton's candidacy lame from the start in order to impede his progress toward getting on the ballot; moreover, it had an additional negative and defamatory impact on his character and professionalism. All of this impacted the public's interest in engaging with a new and different candidate who could engage substantively on all matters of municipal government. This act marred the introduction of the Houton candidacy by shaping the public perception of the candidate. These government officials in the Wu administration attempted to destroy his candidacy directly through their actions in the media.

128.    The people's right to choose a candidate and thereby freely associate and support the advancement of shared values and interests in our democracy is integral to one's participation in the franchise in order to freely exercise one's right to vote. By imposing barriers to Plaintiff's candidacy, the officials, including Cederbaum and Wu and others in the conspiracy, not only harmed Plaintiff but also the people who nominated Candidate Houton and those who would have supported Candidate Houton had he the time necessary to gather signatures to get on the ballot.

129.    The Wu administration's putting up barriers to impede the people's right to freely associate with a candidate who offers an alternative vision for all Bostonians suppresses the constitutional rights of all voters in the city of Boston.

130.    Voters in Boston who wish to exercise their right to vote for such a candidacy were immediately thwarted by the City's action since many people's opinion about Houton's candidacy was tainted at the outset by the City's damning actions in 2021 and 2025 and violated Candidate Houton's First Amendment rights and his right to equal protection under the U.S. constitution, and his rights under Article 9 of the Massachusetts Declaration of Rights.

### CITY OF BOSTON'S MEDIA STATEMENTS ARE DEFAMATORY

131.    Houton's 2025 candidacy was stymied at the outset by at least 3 violations of

Candidate Houton's constitutional rights: 1) the Boston City Charter as described above, and 2) the City's specific act to suspend Candidate Houton by placing him on "administrative leave", and 3) the City making defamatory statements used politically to hinder or impair Houton's candidacy, the latter two actions had the effect of making the candidate lame at the earliest stage of his campaign.

132.    Voters would reasonably infer a negative connotation about the candidate directed from the statement of the City (implying that Plaintiff, while employed as an attorney was put on leave because he is political and partisan and cannot maintain his professional responsibility to provide legal advice but instead would politicize his work environment and be untrusted by those seeking legal advice and guidance) essentially that Plaintiff is political while doing his job. The statement is false with no grounds to support it; the administration cites the simple fact that Plaintiff is a candidate for office. The effect of being placed on leave under this ethical cloud, however, is damning and harmful to Houton's candidacy and his professional reputation as an experienced and trusted attorney advisor.

133.    In placing Plaintiff on leave the city acted without providing Plaintiff due process in violation of the U.S. Constitution; Plaintiff was by right entitled to proceed unimpaired to join the race for mayor without hindrance. However, the City's arbitrary and capricious action inevitably and foreseeably would have a negative impact on Plaintiff and make Plaintiff's candidacy lame as the voting public became aware about the City's defamatory statements falsely presenting Plaintiff as a politically partisan employee.

134.    The City acted on impulse, with a hasty and flawed decision without consideration for Plaintiff's rights or the harmful effect their decision would have on Plaintiff's candidacy.

135.    In addition, to raise ethical or conflict of interest issues now in 2025 and not

in 2021 stretches credulity after Cederbaum has risen to the position of Corporation Counsel. Plaintiff brought this same issue to Cederbaum in 2021 and was made aware of Plaintiff's interest in running for office. Cederbaum acted fraudulently in 2021 achieving his purpose undermining Plaintiff's rights to proceed with his candidacy unhindered like other city employees supported by the Mayor in 2023 and 2025.

136.   In 2025, Corporation Counsel Cederbaum continued his 2021 scheme to impair, block, and delay Houton's candidacy by placing him on administrative leave on May 9, 2025. Candidate Houton had every right to pursue public office in 2025, as in 2021, without impairment of his constitutional rights, or retaliation in his job. There had been no change in city policy regarding employees, including attorneys, running for political office. In fact, Michelle Wu was advancing the campaigns of her hand-picked candidates as she attempts to stack the City Council with her allies. Cederbaum again misused his office to take an unwarranted privilege to politically damage Plaintiff who was attempting to get on the ballot for the preliminary election on September 9, 2025. The City, through Cederbaum's actions, violated Plaintiff's constitutional rights to due process under the equal protection clause of the Fourteenth Amendment.

137.   The City of Boston's statements published in Boston publications had a major and incalculable impact on Houton's candidacy which remains impaired by the damage. For example, Candidate Houton has sought to organize a team to include experienced political campaign treasurer but was politely declined obviously because of the fallout from the actions of the City directed at Plaintiff. They wanted to "sit out" of this election cycle in Boston and obviously stay clear of the Wu team.

138.   Such is the case here when it is even more difficult for a first-time candidate in Houton's position, lacking the resources and network that incumbent politicians are able to utilize, to counter the false and misleading statement distributed by the Mayor's

spokesperson. That statement remains available publicly on online forums and is the last public speech referencing candidate Houton which has not been countered until today in this venue.

139.    Unfortunately, Candidate Houton felt the immediate effect from the publication and broadcast of the City's defamatory statement which first appeared on May 13, 2025. On May 14, 2025 and each day subsequently, numerous registered voters while Candidate Houton canvassed neighborhoods declined to sign Candidate Houton's nomination papers simply because he "was the guy the Mayor put on leave" from work. There were, of course, others who opposed Mayor Wu as expected and signed Plaintiff's nomination papers. However, a significant number each day through May 20th confirmed that they saw the article and mentioned the "conflict of interest" issue and the resulting "placement on leave" status and that was the reason given before walking away. Many others did not give a reason for declining but some confirmed that they saw the articles and continued walking. None of those who declined without a reason were willing to answer question why.

140.    Plaintiff declared his candidacy by filing a statement of candidacy for the office of Mayor of Boston with the City's Election Department on May 2, 2025. The impact of the suspension on Plaintiff by the City, and the City's public statements (described below) about Candidate Houton published in various newspapers has defamed and damaged Candidate Houton, violated his First Amendment rights and rights to equal protection thereby directly impacting his ability to get access to the ballot, and has injured him irreparably as well as professionally, and in other ways that continue to unfold as Candidate Houton sought to canvass Boston neighborhoods for the 3000 requisite signatures nominating him to be on the ballot for the September 9, 2025 preliminary election.

141.    Suspending Candidate Houton under a cloud of ethics had the effect of putting a lame status on Houton's candidacy. It constitutes a direct act based on political discrimination in violating of Candidate Houton's first amendment rights to impede Houton's 2025 candidacy. It is an act by the City of Boston ultra vires, an act entirely politically driven in retaliation that began in April 2021 for Plaintiff attempting to get on the ballot.

142.    Moreover, Plaintiff experienced retaliation in his job as a result of his efforts running for office in 2021. Retaliation began in 2022 and grew over the following 2 ½ years while working at the Treasury Department. Retaliation appeared in all aspects of his responsibilities having been diminished or taken away and Plaintiff was isolated and friendly colleagues were told to stay away from Plaintiff and his work station. Plaintiff applied for various jobs commensurate with his knowledge, skills and experience but was not considered though he was given a sham interview and nothing more despite the fact he was eminently qualified. Plaintiff experienced a hostile work environment and had to face a series of pretext job performance issues in a conspiracy to undermine Plaintiff in his job in the Treasury Department. This hostile work environment was fostered and advanced by his new supervisor Jerica Bradley, previous supervisor Maureen Garceau, and Director of Trusts, Margaret Dyson in the Treasury Department and facilitated by Adam Cederbaum in the Law Department.

143.    This retaliation is the result of Plaintiff exercising his First Amendment Rights under the U.S. Constitution and the Declaration of Rights contained in the Massachusetts Constitution to run for office as a candidate for mayor.

144.    The Boston City Hall RICO Enterprise, employing the City's operations and appointees, and various personnel, has worked against Candidate Houton while the same enterprise advances Wu and her preferred candidates. In addition, the enterprise uses City

resources for personal political purposes to strengthen Wu's grip across the City and

throughout the neighborhoods.

145.    The CommonWealth BEACON published a second article online on May 13,

2025 updating its audience on the status of Houton's candidacy.

The article was titled: "Wu administration puts City Hall attorney on leave amid his

mayoral run – *Outside counsel brought in as he presses ahead with campaign.*"

The article reported that Candidate Houton believed his being placed on leave from
the City, and under investigation by outside counsel, "is an intimidation tactic by the
Wu administration" since the mayor had encouraged previous city "employees to
run for office" and Houton had stated "everything has been above board by me."

As reported, the Wu administration provided the following statement: "In order to
perform its essential functions, **the Law Department's work depends on being
fully non-political in its operations**, and, importantly, the Department **must be
perceived as non-political by Cabinet Chiefs and Department heads seeking
advice and counsel**," the spokesperson said."

146.    The Boston Globe published an article on May 13, 2025, in which Candidate

Houton was quoted: "I'm very disappointed that I'm being challenged and intimidated to

not run,"…"It's caused some issues, but I'm holding steadfast in trying to get my

signatures so I can be on the ballot."

147.    The May 13, 2025 Boston Globe article included the same City statement as

appeared in The CommonWealth Beacon article that day:

Title: "Boston city staff attorney running for mayor placed on paid administrative
leave by city officials" by Niki Griswold, Boston Globe, May 13, 2025.

"The Law Department's work depends on being fully non-political in its operations,
and, importantly, the Department must be perceived as non-political by Cabinet
Chiefs and Department heads seeking advice and counsel,' City of Boston
spokesperson Jessica Pierre said in a statement."

148.    In addition to the City's defamatory statement provided by spokesperson

Pierre, the Boston Globe article written by Niki Griswold included an intentional falsehood

prominently appearing in its title : "**Boston city *staff attorney* running for mayor placed**

**on paid administrative leave by city officials**.” (Note: emphasis added in bold). In the

first paragraph of the article it stated “**City of Boston officials have placed a *staff attorney***

**on paid administrative leave as the employee pursues a bid for mayor**.”  The reference

to Plaintiff as a “staff attorney” is a false statement, an intentional act to present Candidate

Houton in a false light to the public and to diminish the significance of his candidacy by

negating his professional experience, character and stature alongside other candidates. It’s

an attempt to cast Candidate Houton off as a junior and inexperienced attorney rather than

the many years of professional experience and expertise that he holds as in-house counsel

to the Treasury Department. This calculated act reveals the political nature of the City’s

modus operandi under Michelle Wu and her administration; this was entirely a political

statement rather than a responsive factual statement in response to a news organization’s

question. Or, was the Boston Globe part of this conspiracy to defraud the public of a voice

that has been suppressed?

149.    The May 13th BEACON article also reported the fact that another city

employee is running for mayor: “a 26-year-old City Hall receptionist, Kerry Augustin, is

also running and no employment action has been taken against him.” The article also

reported that “Wu is running for a second four-year term and is **chiefly facing a challenge**

from Josh Kraft, the son of New England Patriots owner Robert Kraft. Both Wu and Kraft

have gathered enough signatures – over 3,000 – to make it onto the ballot. Ten or so other

people have expressed interest in running for mayor.”

150.    The May 13 BEACON article noted that “Houton has worked as an attorney

[officially: Assistant Corporation Counsel] since the late Tom Menino’s mayoral

administration, notching 18 years with City Hall.” The article quotes Candidate Houton

stating that he has worked as an Assistant Corporation counsel mostly as “in-house counsel

to the city’s treasury department” where he has been since August 2011.

43

151.   In the Treasury, Plaintiff provides counsel centered on the essential functions of the Treasury Department not on policy developed by the Mayor or Mayor Wu's cabinet. Houton provides legal advice mainly pertaining to the department's compliance with municipal finance law in Massachusetts, which is his expertise in the City. Plaintiff has never engaged in political activity at the Treasury Department nor did he provide guidance on developing policy; rather, Plaintiff's advice has consistently been sought specifically for legal guidance on Treasury operations and decisions supporting such functions not as part of the formulation or development of City policy. The City's statement implying that Plaintiff was in any way "political" in his performance is false and defamatory as appearing in news publications. It is false and defamatory and otherwise injurious to Candidate Houton's candidacy and to Plaintiff professionally.

## THE WU-CEDERBAUM CONSPIRACY TO DEFRAUD VOTERS IN THE

## 2021 & 2025 MAYORAL ELECTIONS IN BOSTON

152.   The Defendants in this case deprived Boston's citizens and the municipal corporation itself of the right to have the city's affairs conducted honestly. The Defendants' actions in April 2021 described above wherein Cederbaum deprived Plaintiff of the opportunity to participate in the 2021 election without hindrance or interference and without fear of economic harm. Cederbaum interfered with and frustrated Plaintiff's constitutional rights to participate in the election without such threats. Cederbaum deprived Plaintiff of honest services as a reasonable supervisor would have otherwise acted appropriately and professionally under the rules of professional conduct. As Cederbaum's subordinate, Plaintiff was entitled to honest services. However, Cederbaum in 2021 acted fraudulently, dishonestly, and exploited Plaintiff's fears of losing his job simply because he sought to run for political office and appropriately sought guidance in doing so consistent with his professional responsibility.

153.   Cederbaum breached his fiduciary duty to provide honest services to Plaintiff and to the City of Boston when he was meeting with Plaintiff in April 2021. Cederbaum breached such duty and dishonestly hid his conflict of interest in the outcome of the election when discussing the mayoral election with Plaintiff. Plaintiff was earnestly moving towards filing his statement of candidacy for the office of mayor of Boston when Cederbaum tricked Plaintiff through deceit which cost Candidate Houton valuable time and organization as Cederbaum induced fear of economic harm. Cederbaum's misrepresentations and non-disclosure were intended to deprive Plaintiff, and the voters of Boston, of Cederbaum's honest services.

154.   These numerous fraudulent actions committed by all defendants achieved their purpose of hurting and halting Candidate Houton's chances of getting on the ballot and organizing and launching his campaign for Mayor in 2021. Cederbaum, Plaintiff's supervisor, breached his fiduciary duty as did others in the City who remain unknown as participants in the WU-CEDERBAUM RICO conspiracy.

155.   In May 2025 the Defendants' retaliated against Plaintiff once again because he ran for mayor so Defendants Wu and Cederbaum suspended him from his job and then the City drafted and facilitated the publication of false and defamatory statements about Plaintiff impugning his character and professional reputation and undermined his candidacy by providing such statements to news media for publication to the general public and thereby giving such statements the moniker of legitimacy because they were provided by an official government spokesperson. The city's public statements provided to news organizations  greatly harmed plaintiff professionally, and Candidate Houton politically, and created the fraudulent appearance the city suspended Plaintiff, an Attorney, for ethical issues of a partisan political nature. These fraudulent actions achieved their purpose of hurting and halting Candidate Houton's chances to get on the ballot and challenge the

incumbent mayor in 2025. Cederbaum wrongfully suspended Houton under color of law to protect Michelle Wu as a candidate and remove a serious challenger, such as Plaintiff's potential candidacy represented. The City of Boston defamed Plaintiff professionally and used the offices of city government to politically retaliate against Plaintiff, a candidate for the office of mayor, in violation of Plaintiff's First Amendment rights of free speech, association, and the voters' rights of association; Plaintiff had a right to seek office under the Equal Protection Clause of the 14th Amendment, and Article 9 of the Massachusetts Declaration of Rights, without interference from Wu, Cederbaum and the City of Boston.

## COUNT I

### Equal Protection Clause of the Fourteenth Amendment

156.    Plaintiff hereby incorporates by reference the  previous  allegations  of the Complaint as if set forth at length herein.

157.    Under the First Amendment and the Equal Protection Clause of the 14th Amendment as applied to the states, and under the Massachusetts Declaration of Rights, Art. 9, Plaintiff has a right to seek public office in Massachusetts in that running for public office is a fundamental constitutional right in Massachusetts. The Mayor of Boston and her appointee and co-conspirator Defendant Cederbaum cannot encourage, facilitate and support other city hall employees to run for the City Council yet suspend Plaintiff because he is running for the Office of Mayor. Plaintiff must be treated equally as other similarly situated individuals even under these circumstances as he is an attorney for the City.

158.    In addition, Defendant City of Boston Election Department, through the Boston City Charter, applied a restriction which was a barrier to candidate Houton's access to the ballot for the preliminary election for mayor on September 9, 2025 by

denying Candidate Houton, and other potential candidates excluded from the ballot, the required necessary time in which to associate with registered voters to obtain their support and signature for nomination to appear on the September ballot. Such a restriction in Boston on the exercise of fundamental rights in Massachusetts violates the Equal Protection Clause of the 14th Amendment and denies Plaintiff the equality of treatment in Massachusetts that is guaranteed him by the United States Constitution and under Article 9 of the Massachusetts Declaration of Rights

159.    Under the Boston City Charter, candidates for the office of mayor must obtain the signatures of 3,000 qualified voters over a duration of just 21 days in order to appear on the ballot for mayor in citywide elections. However, a different duration standard applies in mayoral elections of other cities, as well as statewide offices, throughout the Commonwealth of Massachusetts. The time duration for obtaining signatures required for those elections is much greater and therefore less stringent than in Boston. In the city of Boston, application of this restrictive standard has produced the incongruous result that aspiring or new candidates have substantially less time, or, rather opportunity to participate in the process (engage and associate with registered voters) for obtaining the required nomination signatures to gain access to the ballot than a similarly situated candidate for municipal office outside of Boston as well as those seeking statewide office. This discrepancy violates the Equal Protection Clause of the Fourteenth Amendment and greatly explains why Boston's mayoral elections are anticompetitive.

160.    The remaining Defendants' have ignored the constitutional violations associated with the City of Boston Charter and must comply with the appropriate relief of this court by order of mandamus to implement the court's relief regarding the ballot in Boston.

**WHEREFORE,** Plaintiff respectfully requests that the Court:

(a)    enjoin the use of all ballots, and the printing thereof, involving the 2025

general election ballot for the electoral district of Boston;

(b) enjoin the production and printing of any all ballots for the City of Boston on which Plaintiff's name is not included as a candidate in the general election for the office of Mayor of Boston;

(c) declare sections 24, 24A, and 25 of the City of Boston Charter unconstitutional and as it pertains to, and as applied to, Plaintiff's candidacy in 2025 to seek the office of Mayor in the city of Boston;

(d) in the alternative declare Plaintiff eligible to appear on the general election ballot as a candidate for Mayor due to the unconstitutional violations herein described and order the Secretary of State of Massachusetts to order a new mayoral election to take place in sixty (60) days to allow Plaintiff and all Bostonians to have an election for mayor so that voters can vote their choice effectively rather than have no choice due to the fraudulent activity that produced the present "unopposed" circumstance of Boston's municipal mayoral election as the result of honest services fraud in city government; and

(e) that this Court grant an award of actual and nominal, compensatory, and punitive damages against Defendants City of Boston and as just and appropriate against each individual personally for violating Plaintiff's constitutional rights and retaliating against Plaintiff through a conspiracy of fraudulent activity and honest services fraud and related predicates to Plaintiff in an amount this Court deems appropriate;

(f) award attorney's fees, costs, interest, and such other relief as the Court deems equitable and just;

(g) declare such other relief as just and appropriate under the circumstances.

48

**COUNT II**

**Request for Injunctive and Declaratory Relief**

**(Boston City Charter Unconstitutional and as Applied to Plaintiff)**

**The Provision of Boston's City Charter**

161.   Plaintiff hereby incorporates by reference the previous allegations of the Complaint as if set forth at length herein.

162.   Under the Equal Protection Clause of the 14th Amendment, Plaintiff has a right to seek public office.

163.   The Boston City Charter, specifically its ballot access sections 24 & 24A and 25 (the filing deadline coupled with the high signature requirement), is unconstitutional as it severely burdened Plaintiff's First Amendment and Equal Protection Clause of the Fourteenth Amendment rights as a candidate trying to gain access to the ballot in Boston's mayoral election in 2025, and in 2021, and violated voters' right to associate with aspiring candidates, including Candidate Houton, and cast their ballots according to their preferred choice of candidate.

**COUNT III**

**Violation of First Amendment**

**(Boston City Charter Unconstitutional and as Applied to Plaintiff)**

**The Provision of Boston's City Charter**

164.   Plaintiff hereby incorporates by reference the previous allegations of the Complaint as if set forth at length herein.

165.   The Boston City Charter, specifically its ballot access sections 24 & 24A and 25 (the filing deadline coupled with the high signature requirement), is unconstitutional as it severely burdened Plaintiff's First and Fourteenth Amendment rights as a candidate

49

trying to gain access to the ballot in Boston's mayoral election in 2025, and in 2021, and violated voters' right to associate with aspiring candidates, including Candidate Houton, and cast their ballots according to their preferred choice of candidate.

166.    The ballot access provision of the Boston City Charter operates as a mechanism to exclude candidates like Plaintiff from the electoral process.

167.    In its establishment, preparation, implementation, and enforcement of Boston City Charter election statutes, ordinances, regulations, and policies related to Boston mayoral elections, specifically in 2021 and 2025, the City purposefully and intentionally treated Plaintiff differently as a candidate from similarly situated candidates across Massachusetts.

168.    In its establishment, preparation, implementation, and enforcement of Boston City Charter election statutes, ordinances, regulations, and policies related to Boston mayoral elections, specifically in 2021 and 2025, the City purposefully and intentionally treated registered voters differently from similarly situated voters across Massachusetts denying Boston voters their right, as individuals, to associate for the advancement of political beliefs by engaging in their First Amendment rights of expression by a an unreasonably short deadline for candidates to obtain access to the ballot. Such a short time frame is a structural barrier that restricts a candidate's voice from being heard by through the only process for getting on the ballot. A sudden end to aspiring candidates' opportunity voters who wish to join and associate with a new candidate, is silenced.

169.    Unlike voters across Massachusetts who benefit from the time allotted candidates to engage with voters in the community during the nomination period for ballot access, the opportunity to participate in the political process the availability of political opportunity in Boston to similarly participate barely exists; rather, such opportunity is

stolen, taken away from candidates and voters alike by the Boston City Charter provisions described in this Complaint. The right of qualified voters in Boston, regardless of their political persuasion, to cast their votes effectively on September 9, 2025 was undermined by the extremely short period (21 days in 2025) of engagement with candidates who were "clamoring for a place on the ballot."

170.    Boston is set apart from the rest of the state where the process for getting on the ballot is fair and rational and allows candidates the time necessary to achieve whatever signature count is required in order to gain access to the ballot without concern for ballots with frivolous or otherwise non-serious candidates.

## COUNT IV

### Violation of 42 U.S.C. § 1983: First Amendment (Free Expression)

171.    Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth herein.

172.    The City of Boston Defendants' conduct suspending Plaintiff on May 9, 2025 because he filed a statement of candidacy on May 2, 2025 for mayor of Boston infringed upon Plaintiff's rights to free expression and the rights of voters to associate with Candidate Houton deprived Plaintiff of his right to Due Process as guaranteed by reason of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983, and violated the Equal Protection Clause of the 14th Amendment by denying Plaintiff as an employee the equality of treatment that is guaranteed to him by the United States Constitution.

173.    Other city employees sought and did run for political office in the City of

51

Boston and were not treated the same as Plaintiff. Such other employees were allowed to run for office without suspension, did not receive retaliation from the City including defamatory and false statements which negatively impacted their candidacy.

174.    Plaintiff re-alleges and incorporates herein, as though fully set forth, Paragraphs 1 through 124 of this Complaint.

175.    The First Amendment's Freedom of Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits censorship of protected expression.

176.    Non-disruptive, private expression is protected by the First Amendment.

177.    Plaintiff's speech is protected speech under the First Amendment.

178.    Plaintiff's expression did not and does not materially and substantially interfere with the orderly conduct of City of Boston activity.

179.    The statements Plaintiff made to reporters are exclusively Plaintiff's private expression on matters of public concern and are not speech pertaining to or related to his employment as an attorney for the City of Boston.

180.    But Defendants have acted politically and retaliated against Plaintiff acting under color of law to intentionally interfere with Plaintiff's First Amendment rights to be a candidate, and singled out Plaintiff's expression and his filing a statement of candidacy for mayor by suspending and removing Plaintiff from his job, libeling his professional reputation and thereby damaging his public persona and character as a candidate preventing him from establishing his public persona as a first time candidate separate and apart from that which the Wu administration sought to define while using the instrumentality of the government in doing so.

181.    Viewpoint-based restrictions or retaliation, whether in a public or nonpublic

forum, are unconstitutional.

182.   Content-based restrictions on speech in a public forum are presumptively unconstitutional and are subject to strict scrutiny.

183.   Time, place, and manner restrictions on speech must be content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

184.   Defendants' censorship of Plaintiff through suspension and intimidation through defamatory statements while permitting other employees with different political messages on matters of public concern is viewpoint discrimination, which is unconstitutional in any type of forum.

185.   Defendants expressly interpret their policy to prohibit the expression of certain viewpoints without regard to whether the expression materially or substantially disrupts the City of Boston, its operations, or its administration, or the achievement of any legitimate governmental objective.

186.   Defendants' unequal treatment of Plaintiff's expression is also a content-based restriction of his speech in an otherwise open forum.

187.   Pursuant to their speech and political activities and expression policy and practice, Defendants allow other city employees to run for office and engage in a wide variety of expressive messages, including employees running for office in the same municipal election as Plaintiff, promoting and advancing many policies and initiatives in agreement with Michelle Wu while Plaintiff was punished for expressing his viewpoint which is different from that of Michelle Wu.

188.   Defendants' political activity restrictions policy and practice also imposes an unconstitutional heckler's veto because the City permits the restriction of protected

political expression merely because city officials deem a private citizen's expression a matter of governmental concern or interest simply because Plaintiff is employed by the City of Boston.

189.   Prior restraints on speech may not delegate overly broad discretion to government decision-makers, may not allow for content-based restrictions, must further a compelling government interest, must be narrowly tailored, and must be the least restrictive means available.

190.   Defendants' political activity restrictions policy and practice imposes an unconstitutional prior restraint on Plaintiff's First Amendment rights of speech and association in engagement with voters, but additionally Cederbaum used his discretion to implement and add a further restriction: suspension from his job, because Plaintiff was expressing himself as a candidate for the office of the mayor who appointed Cederbaum, her longtime friend. The suspension had an overwhelming and deleterious impact on Plaintiff's candidacy by establishing a negative connotation to Plaintiff's candidacy in the public eye and when combined with certain elements of the City's political activities restrictions/prohibitions contained in its policy, combined with the City's defamatory statements, struck Plaintiff lame as a candidate unable to recover or advance his campaign given the overarching restriction contained in the City Charter provisions. Mayor Wu vests city officials with unbridled discretion to permit or deny employee expression subject to no standards or guidelines, thereby permitting content and viewpoint-based enforcement of the policies.

191.   Defendants' political activity restrictions policy and practice give unbridled discretion to city officials by permitting them to forbid activity they deem inappropriate (speaking on matters of public concern about the City of Boston's during an election) and

allow activity they deem appropriate (city employees running for public office who agree with Michelle Wu on matters of public concern), that target individuals based on viewpoint and expression, or are otherwise "unacceptable" to the Mayor's or her appointees' viewpoint.

192. Defendants' nebulous political activities and expression policy and practice is overbroad because they sweep within their ambit protected First Amendment expression.

193. Defendants' political activities and expression policy and practice is overbroad because the City restricts private speech that does not and will not materially and substantially disrupt the internal operations and administration of government.

## COUNT V

### First Amendment: Free Expression and Equal Protection Clause of the Fourteenth Amendment, Violation of 42 U.S.C. § 1983

194. Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth herein.

195. As described above, in May 2025, commencing with Plaintiff's May 2, 2025 filing of his Statement of Candidacy for the Office of Mayor of Boston and his comments appearing in the Commonwealth Beacon on or about May 7, 2025, engaged in protected speech as a private citizen on matters of public concern. Plaintiff was immediately subjected to retaliation by being suspended (placed on administrative leave) because he was a candidate for the office of mayor speaking on matters of public concern. Plaintiff was removed from his job as a result of exercising his First Amendment rights under the U.S. Constitution.

196. In 2021 and 2025 Plaintiff had a right under the First Amendment and the

Equal Protection Clause of the 14th Amendment, and under the Massachusetts Declaration of Rights, Article 9, to seek public office in Massachusetts and, particularly in Boston where Plaintiff resides but was thwarted by governmental action at such times as Plaintiff was engaged as a candidate pursuing access to the ballot in the Boston Mayoral election. Indeed, being placed on leave in 2025 had immediate compounding negative effects harming Plaintiff's candidacy.

197.   Defamatory statements were made by the City of Boston resulting in the publication and broadcast of false statements impugning Plaintiff's candidacy tainting Plaintiff's character and professionalism, negating his nearly 20 years of professional service to the City of Boston, negatively and wrongfully portraying Plaintiff as a politically partisan staff attorney.

198.   Defendant Cederbaum's suspension of Plaintiff because he was a candidate for public office violated Plaintiff's First Amendment rights and his rights under the Equal Protection Clause of the 14th Amendment of the U.S. Constitution, and the Massachusetts Declaration of Rights, Article 9; and Cederbaum's action was intended to, and had the effect to, undermine Plaintiff's candidacy for mayor of Boston and impair Plaintiff's opportunity to get on the ballot for the preliminary election on September 9, 2025, and thereby denied voters in Boston the right of association with their choice of candidate. Cederbaum's action was done to extend and continue the RICO conspiracy through the Boston City Hall RICO enterprise to maintain control of the City of Boston denying Plaintiff honest services, continuing the fraud on Plaintiff, the public, and the City of Boston which began in April 2021 when Plaintiff sought guidance from Cederbaum, his supervisor, on proper Law Department protocol to apply and follow for when Plaintiff would file his candidacy for mayor at the Boston Election Department.

199.    The continuing administration of elections in Boston in accordance with the

Boston City Charter indicates the unlawful administration by state officers of a state statute

violative on federal and state constitutional rights, though even if fair on its face, resulting

in its unequal application to those candidates and voters in Boston who are entitled to be

treated alike is a denial of the equal protection of the law as guaranteed by the Fourteenth

Amendment and the actions of the Defendants is willful and malicious and that the failure

to end enforcement of such City Charter in this manner presents an unequal, unjust, and

oppressive administration of the state laws.

## COUNT VI

**Violation of Fourteenth Amendment to the U.S. Constitution, Procedural Due Process**

**Pursuant to 42 U.S.C. § 1983**

200.    Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth

herein.

201.    The Fourteenth Amendment to the U.S. Constitution prohibits states, and

their political subdivisions, from depriving "any person of life, liberty, or property, without

due process of law."

202.    Plaintiff, as a public employee, has a legitimate claim of entitlement to, and

protected property interest in, continued employment with his tenure as a nearly 20-year

employee, dedicated in public service as counsel in the City of Boston, when he was

arbitrarily and capriciously suspended from his job because he exercised his First

Amendment right to pursue elected office in Boston.

203.    Other similarly situated employees of the City of Boston also exercised their

First Amendment rights to seek office and were not removed from their job.

204.    On May 9, 2025, the Cederbaum, and the City, acted under color of state law

to deprive Plaintiff of his property interest without due process of law in violation of his

procedural due process rights under the Fourteenth Amendment.

## COUNT VII

## 18 U.S.C. § 1962(d)

## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT

## ORGANIZATIONS ACT (18 U.S.C. § 1962(c))

205.    Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth

herein.

206.    Defendants Wu, Cederbaum, Groffenberger, Garceau, Bradley, Dyson, John

Doe 1, John Doe 2, Jane Doe 1, each qualify as "persons" under 18 U.S.C. § 1961(3).

207.    Each is liable under § 1962(c) for conducting the affairs of the enterprise

through a pattern of racketeering activity.

208.    At all relevant times, the Defendants, together with others known and

unknown, formed an "enterprise" within the meaning of 18 U.S.C. § 1961(4), namely

Boston City Hall.

209.    As shown herein, under Defendant Wu, Boston City Hall is an organization

engaging in crime, unlawful acts, deception, and fraud.

210.    Upon information and belief, the crimes undertaken by the Mayor of Boston

(Defendant Michelle Wu), Corporation Counsel (Defendant Cederbaum), and the

individual Defendants herein may be more than those specified herein and the complete list

remains unknown.

211.   The enterprise has a distinct structure, continuity of purpose, and operates through a coordinated pattern of decision-making among its members. The Defendants participated in the operation and management of the enterprise. The Defendants fraudulently and corruptly used the resources, property, facilities, and personnel of Boston City Hall and its various departments, systems, and processes to commit the predicate acts to achieve their common purpose.

212.   Since the Boston City Hall Enterprise gained additional power to "racketeer" and further engage in wire fraud and the other predicate acts specified below by "taking over" the government of the City of Boston in November 2021 through fraud and extortion, in part induced by the wrongful use of fear, and under color of official right, this RICO enterprise exercised additional power to do evil by taking over and infusing legitimate governmental authority with an illegitimate and corrupt purpose to commit the predicate [racketeering] acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of its association with the City of Boston, which the defendants use as a vehicle for racketeering, corrupting otherwise lawful governmental authority.

213.   Michelle Wu's real purpose in dismantling the Boston Redevelopment Authority is to effect the biggest transfer of private land and wealth by stunting the growth in private property sales, decrease the value of private property, and increase the acquisition of such private property and reallocate it for "public purposes", to wit, to provide housing for massive numbers of people who cannot afford housing, as they are already largely dependent on government assistance for their housing. What the Wu ideology leads to is a variation of what China, Russia, and Zimbabwe have done, by appearing to negotiate with private landowners to pay market prices but inevitably leads to meager compensation with little opportunity to resist. Her intent is to reallocate such

property, i.e., transfer such property, to non-profits to build housing developments primarily for low income residents. The plan includes reshaping housing downtown to transition as much as possible from commercial property to residential with much of the conversion intended to be low income housing developments.

214.   These are issues of public concern for which Plaintiff as a candidate sought to get on the ballot to challenge Mayor Wu by Plaintiff exercising his constitutional rights to be a candidate in Massachusetts. It is Candidate Houton's objective to halt such land acquisition policies which are violative in their own right of citizen's right to acquire, own and preserve and protect private property in the Commonwealth of Massachusetts. Governments worldwide in history have often forcibly taken land with little or no compensation and have altered the market for land resulting in a trap of underdevelopment. Workers will no longer have incentive and businesses will no longer seek to move or conduct their business in Boston if they find the market inhospitable. Entrepreneurs, small businesses, banks, and individuals and families will be wary of investing in Boston because they will deem property a risky bet. Low output and stagnation is the path to ruin Boston is heading on under the Wu administration. Indeed, additional matters of public concern are at stake as the full playbook that the Wu administration plans to unleash on the city in her second term will compound Boston's troubles with her climate policies, land policy, and social engineering, and political control will see a once dynamic economy in Boston begin to stall as the best and brightest lights fade away to the suburbs or seek refuge and freedom out of state. With decreasing attractiveness and protections for property rights in Boston corruption will rise and a lack of trust and underinvestment will trigger a downward spiral of quality of life and property values in Boston in the coming years.

215.   The scenario above is what is in store for Bostonians as the corrupt Boston

City Hall enterprise retains control over the government of the City of Boston.

216.  Defendant Wu's ability to commit the predicate acts was inextricably intertwined with her authority in 2021 as City Councilor At-Large, and Candidate for Mayor, and continued with her being elected as Mayor on or about November 2, 2021, and her activity as Mayor of Boston.

217.  Defendant Cederbaum's ability to commit the predicate acts was inextricably intertwined with his authority in 2021 as Chief of Government Services, and continued with his appointment as Corporation Counsel on or about November 18, 2021, and his activity as a supervisory and managerial employee and as department head of the Law Department.

218.  Defendant Groffenberger's ability to commit the predicate acts was inextricably intertwined with her authority as Chief Financial Officer and Collector-Treasurer of the City of Boston and her activity as a cabinet member and supervisory employee of the Finance and Administration Cabinet of the City of Boston. Defendant Garceau's ability to commit the predicate acts was inextricably intertwined with her authority as First Assistant Collector-Treasurer and her activity as department head of the Treasury Department.

219.  Defendant Bradley's ability to commit the predicate acts was inextricably intertwined with her authority as Temporary Second Assistant Collector-Treasurer, then as Temporary First Assistant Collector-Treasurer and then as permanent First Assistant Collector-Treasurer, and her activity as a deputy head and subsequently as department head of the Treasury Department.

220.  Defendant Dyson's ability to commit the predicate acts was inextricably intertwined with her authority as Director of Trusts and her activity as a supervisory

employee of a division within the Treasury Department.

221.    The Defendants engaged in a pattern of racketeering activity by committing numerous predicate acts. These acts constituted a pattern of racketeering activity as defined in 18 U.S.C. § 1961(1), including but not limited to:

222.    **Wire fraud (18 U.S.C. § 1343):** The use of interstate email and telecommunications by Defendants to misrepresent and undermine Houton's authority, and use false or fraudulent pretenses, conceal material facts, and coordinate a scheme to defame and marginalize Plaintiff at work and interfere with and retaliate against plaintiff for exercising his First Amendment rights to run for elective office in Massachusetts;

223.    **Obstruction of justice (18 U.S.C. § 1503):** Interference with potential or actual investigations triggered by Houton's whistleblowing, including efforts to silence or isolate Plaintiff;

224.    **Retaliation against a witness or informant (18 U.S.C. § 1513):** Adverse employment actions in retaliation for his protected disclosures about misconduct, corruption, and violations of lawful and fiduciary duties in the administration of City of Boston trust funds;

225.    **Tampering with a witness or informant (18 U.S.C. § 1512):** Acts designed to prevent Plaintiff from reporting continuing criminal conduct including extortion and honest services fraud, federal program theft/bribery, wire fraud, and honest services fraud in the promotional/hiring process in the Treasury Department, and isolation, removal of duties and responsibilities; assigning duties to other non-legal staff;

226.    **Bribery (18 U.S.C. § 201; M.G.L. 268A, §2):** On information and belief, Defendants engaged in, supported, condoned, or facilitated acts of bribery or quid pro quo exchanges and transactions to secure loyalty, suppress dissent, and shield individuals

within the administration from exposure;

227.    **Theft, Bribery concerning federally funded programs (18 U.S.C.A. § 666):** The members of the Boston City Hall Enterprise, known and unknown, being agents of the government of the City of Boston however without authority under law intentionally misapplied federal program property that is valued at $5,000 or more and which was under the care, custody, or control of the City of Boston, Mayor's Office of Housing, and the Boston Housing Authority, and other agencies or instrumentalities of the City of Boston. The Boston City Hall Enterprise corruptly solicited or demanded for the benefit of third parties, money from developers with the intent to be influenced or rewarded in connection with some business, transaction, or series of transactions of the City of Boston; namely, approvals from the City of Boston's Mayor's Office of Housing.

228.    **Interference with commerce by threats or extortion (18 U.S.C. § 1951 – Hobbs Act):** The use of official authority to coerce and intimidate Houton into forgoing the exercise of his fundamental rights to run for public office, to silence him, and interfering with his professional career, future employability, and economic livelihood; there was a series of corrupt exchanges for specific official actions to interfere with Plaintiff's rights to run for public office as Mayor of Boston in 2021 and 2025; the deprivation of honest services while Plaintiff engaged in his lawful duties and responsibilities, and those related to promotional opportunities sought by Plaintiff;  the use of threats, deception, and intimidation in the workplace by Law Department and Treasury Department personnel intended to interfere with Plaintiff's contractual rights in employment; the denial and withholding of honest services when there is a lawful and fiduciary duty to provide honest and responsive material information or supervisory guidance; all these actions done as part of the exchange of something of value in a quid pro

quo promise or solicitation by or on behalf of Michelle Wu.

229.   The racketeering acts are related and continuous, forming a coordinated scheme to retaliate against Plaintiff for exercising his First Amendment rights and rights under the Massachusetts Declaration of Rights, Article 9, and interfering with his lawful duties as Assistant Corporation Counsel to the municipal corporation, the City of Boston, suppressing and interfering with the lawful performance of his duties in the Treasury Department.

230.   These acts occurred over an extended period of time and present an ongoing threat of repetition, satisfying the continuity requirement under 18 U.S.C. § 1961(5).

231.   Each of these acts were related, continuous, and part of a broader scheme to corruptly consolidate political control over the government of the City of Boston, including the Office of the Mayor, the so-called Mayor's Office of Housing, and all other departments, agencies, independent bodies politic, the Boston Police and Fire Departments, the Schools Department, and to stack the City's legislative body, the Boston City Council with Wu acolytes and loyalists; to unlawfully dismantle the Boston Redevelopment Authority and consolidate personal control over planning and development in Boston; to unlawfully use public funds and resources to influence and reward private individuals, groups and organizations that further expand Michelle Wu's political activities, relationships and campaign, but not the public interest, enabling the enterprise to profit off of the citizens of the city of Boston, yet deny the "right of individuals to associate for the advancement of political beliefs" and obstruct "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." supra at ¶2.

**COUNT VIII**
**RICO Conspiracy (18 U.S.C. § 1962(d))**

232.    Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth herein.

233.    Defendants agreed to and did knowingly enter into a conspiracy to violate 18 U.S.C. § 1962(c), with the purpose of furthering the affairs of the enterprise through a pattern of racketeering activity.

234.    Each Defendant knowingly agreed to facilitate the operation and management of the enterprise and took overt acts alleged above.

235.    As a result of this conspiracy, Plaintiff Houton suffered the injuries described herein and seeks relief as provided under 18 U.S.C. § 1964(c).

## COUNT IX

### First Amendment Retaliation 42 U.S.C. § 1983

236.    Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth herein.

237.    As set forth above, Plaintiff engaged in protected speech as a private citizen on matters of public concern and experienced repeated retaliation for his speech since April 2021 and suffered consequences for exercising his rights of free expression and association including changes in terms and conditions of his employment, work duties and responsibilities reassigned to others unqualified, nonlawyers, isolation by design at work, and fraud and deception by managers to whom Plaintiff provided legal counsel to client – City of Boston a municipal corporation, political subdivision of the Commonwealth of Massachusetts; Defendants deprived Plaintiff of honest services while Plaintiff engaged in his lawful duties and responsibilities;

238.    Defendants denied honest services related to promotional opportunities

sought by Plaintiff;

239.    Defendants used threats, deception, harassment and intimidation in the workplace by Law Department and Treasury Department personnel intended to interfere with Plaintiff's contractual rights in employment; the denial and withholding of honest services when there is a lawful and fiduciary duty to provide honest and responsive material information or supervisory guidance.

## COUNT X

### Massachusetts Whistle Blower Act;  M.G.L. c.149 §185, et seq.

240.    The actions of the Defendants as set forth herein constitute a violation of the Massachusetts Whistle Blower Act  M.G.L. c.149 §185, et seq. in that the Defendants have retaliated against Plaintiff for his having brought a complaint of improper and unlawful treatment against him to various public officials.

## COUNT XI

### Tortious Interference Against Defendants Wu, Cederbaum, and Bradley, Dyson, and Garceau

241.    For improper and tortious reasons, the Defendants Wu, Cederbaum, Dyson, Bradley, and Garceau have attempted to interfere with Plaintiff's contractual agreement and arrangement with the City of Boston as an experienced attorney with nearly 20 years of public service to the City of Boston. The actions of Wu, Cederbaum, Bradley, Dyson, and Garceau therefore constitute tortious interference in violation of the Common Law.

## COUNT XII

### First Amendment; 42 U.S.C. §1983

242.    The actions of the Defendants as set forth above constitute unlawful political

discrimination against the Plaintiff because of his protected political activity in violation of the First Amendment of the United States Constitution. In addition, Defendants' actions constitute unlawful retaliation in violation of the First Amendment for Plaintiff's actions in petitioning for redress of grievances and exercising his freedom of association. This claim is asserted pursuant to 42 U.S.C. §1983.

## COUNT XIII

### Municipal Liability Under (42 U.S.C. § 1983)

### Defendant City of Boston – MONELL CLAIM

243.    Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth herein.

244.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

245.    The aforementioned customs, policies, usages, practices, procedures and rules of the City of Boston included, but were not limited to, suppressing speech of a public employee engaged in First Amendment activity through harassment and retaliation, committing violations of the conflict of interest law of the Commonwealth of Massachusetts, and crimes such as Hobbs Act extortion and honest services fraud, mail fraud, wire fraud, in practices so persistent and widespread that they constituted acts of policymakers. In addition, as detailed throughout this complaint, individual policymakers directly participated in and/or tacitly condoned the retaliation which Plaintiff was subjected to. Individual policymakers within the City of Boston participated in such actions and failed to halt this retaliatory activity or discipline those engaged in such activity.

246.    The foregoing customs, policies, usages, practices, procedures and rules of the City of Boston constituted deliberate indifference to the constitutional rights of Plaintiff.

247.    The foregoing customs, policies, usages, practices, procedures and rules of the City of Boston were the direct and proximate cause of the constitutional violations suffered by the Plaintiff.

248.    The foregoing customs, policies, usages, practices, procedures and rules of the City of Boston were the moving force behind the constitutional violations suffered by Plaintiff.

249.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of Boston, Plaintiff was subjected to harassment, demoted, and constructively fired.

250.    As a result of the foregoing, Plaintiff is entitled to compensatory and economic damages in an amount to be fixed by a jury and is further entitled to punitive damages against the individually named Defendants in an amount to be fixed by a jury, plus reasonable attorney's fees, costs, and disbursements associated with this action.


## COUNT XIV

## SUBSTANTIVE DUE PROCESS (42 U.S.C. § 1983)


251.    Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth herein.

252.    The Defendants City of Boston, Wu, Cederbaum, Groffenberger, Bradley, Dyson, Garceau, John Does 1-10, Jane Does 1-5, in their official capacities, acting under

color of law, are liable to the Plaintiff for subjecting Plaintiff to conduct that violated Plaintiff's right to substantive due process of law guaranteed by the Fourteenth Amendment to the United States Constitution, enforceable by 42 U.S.C. § 1983.

253. The conduct of the Defendants herein, collectively and individually, was extreme and outrageous and cause Plaintiff to be deprived of his property right to employment by retaliating against Plaintiff since 2021 election including isolation in his workplace, reassigning his duties to other employees, going around Plaintiff and obtaining legal advice routinely from the Law Department directly when such was the routine duties of Plaintiff in his job, harassing Plaintiff and lying to plaintiff in meetings when feigning one purpose of the meeting for the provision of his good counsel yet creating false imperatives in order to create a trap and pretext to undermine Plaintiff in his work for the purpose of retaliation and removing Plaintiff, and retaliating against Plaintiff and conspiring to alienate and eventually remove Plaintiff from his employment;

254. Plaintiff did not receive proper notice of his suspension and constructive termination as Assistant Corporation Counsel.

255. The above-described violation of Plaintiff's right to due process of law committed by Defendants City of Boston, Wu, Cederbaum, Groffenberger, Bradley, Dyson, and Garceau, as well as John and Jane Does unknown as of the time of the filing of this Complaint violated Plaintiff's right to due process of law guaranteed by the Fourteenth Amendment of the United States Constitution, enforceable through 42 U.S.C. § 1983 and was the direct, proximate cause of Plaintiff's damages.

COUNT XII

## GLOBAL REQUEST FOR INJUNCTIVE AND DECLARATORY RELIEF

256.    Plaintiff hereby incorporates by reference the previous allegations of the Complaint as if set forth at length herein.

257.    Under the Equal Protection Clause of the 14th Amendment, Plaintiff has a right to seek public office in Boston just as other candidates and voters across Massachusetts yet in Boston there is a barrier contained in the Boston City Charter preventing access to the ballot thereby undermining the First Amendment right of free expression and the right of association in Boston.

258.    Defendant City of Boston Election Commissioner's use and enforcement of the Boston City Charter time duration and deadline prevented Plaintiff from obtaining the 3,000+ nomination signatures to get on the ballot for the September 9, 2025 preliminary election for mayor; such short duration combined with a high signature count unconstitutionally restricted Plaintiff's First Amendment right "to associate for the advancement of political beliefs" with voters and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."

259.    order the City to remove such unconstitutional provisions and ensure procedures that shall be implemented to meet constitutional requirements to be approved by the Court Plaintiff violates the Equal Protection Clause of the 14th Amendment and denies Plaintiff the equality of treatment that is guaranteed him by the United States Constitution.

260.    The remaining Defendants' have ignored the constitutional violations associated with the City of Boston Charter and must comply with the appropriate relief of

this court by order of mandamus to implement the court's relief regarding the ballot in Boston.

**WHEREFORE**, Plaintiff John Houton asks this Court to issue and award:

(a)     A declaration that the Boston City Charter §§24, 24A, 25 and any other sections found to be at issue at trial are unconstitutional under the First and Fourteenth Amendments of the United States Constitution, and art. 9 of the Massachusetts Declaration of Rights;

(b)     A declaration that the ballot access scheme in the preliminary election for mayor in Boston was tainted due to the Boston City Charter provisions in question herein are unconstitutional, and order that the general election ballot for mayor, which is akin to the fruit of the poisonous tree and any result therefrom must also be determined invalid and excluded from the official results, and that the court shall order a special election for mayor to be scheduled at a reasonable date forthwith by order to the Secretary of the Commonwealth, and such other and further relief as the Court finds equitable and just;

(c)     An order appointing an independent federal monitor with authority to oversee and report on such special election for mayor of Boston in concert with the Secretary of the Commonwealth of Massachusetts to ensure a free and fair election for mayor in the City of Boston; as well to investigate the Wu administration's use of an enterprise in City Hall to support, facilitate and manipulate the election process in Boston to manage and arrange the stacking of the City Council with her appointed acolytes thereby interfering with the First Amendment rights of free expression and association between candidates and voters in Boston;

(d)     An order appointing an independent federal monitor with authority to

oversee and report on City of Boston internal disciplinary processes, whistleblower protection, and promotional processes and decisions, to ensure compliance with federal and state law to prevent further retaliation, obstruction, and abuse;

(e)     A declaration that the Political Activities and Restrictions Policy issued and practiced by Defendants is unconstitutional under the First Amendment right of Free Speech, Expression and Association and under art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution and Part II, c.1, § 1, art. 4, of the Massachusetts Constitution, and arts. 1, 10 and 12 of the Massachusetts Declaration of Rights;

(f)     Enjoin Defendant City of Boston and individual defendants from taking any further adverse employment actions or injurious actions of any kind against Plaintiff affecting Plaintiff's status as counsel or his property interest in his employment including the terms, conditions, and benefits pertaining to his employment with the City of Boston Law Department and Treasury Department pending the outcome of this litigation;

(g)     A preliminary and permanent injunction enjoining each Defendant from interfering with and retaliating against Plaintiff's right to lawfully engage in constitutionally protected activity in Boston, Massachusetts including while employed at the City of Boston;

(h)     A declaration that defendants, acting individually and collectively, violated Plaintiff Houton's constitutional rights under the First and Fourteenth Amendments, as well as his statutory rights under 42 U.S.C. § 1983, 18 U.S.C. 1962(c)-(d), and Plaintiff's constitutional rights under the Massachusetts Declaration of Rights and the Massachusetts Conflict of Interest Law, c. 268A;

(i)     The Defendants operated an enterprise, as defined under 18 U.S.C. § 1961(4), that engaged in a pattern of racketeering activity under § 1961(1), including but

not limited to obstruction of justice, retaliation against a witness or informant, and wire fraud, and mail fraud, Hobbs Act extortion and honest services fraud, common law fraud, bribery under 18 U.S.C. § 201; M.G.L. c. 268A, §2. The pattern was continuous, related, and directed by persons employed by the City of Boston for the purpose of thwarting Plaintiff from running for mayor of Boston and continued in order to retaliate against Plaintiff for running for public office; moreover, the enterprise engaged in a pattern of racketeering activity which was continuous, related, and directed at facilitating the candidacies of other city employees to run for City Council to remove political opponents from office;  and conspired to use the instrumentalities of the government to achieve such aim and used resources of federal and state grants or funds to organize and carry out the purposes of the enterprise in order to consolidate political power and control over the City Council and throughout Boston;

(j)      That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy in order that such declarations shall have the force and effect of final judgment;

(k)      Damages in an amount to be determined at trial;

(l)      An award of attorney's fees, costs, interest, and expenses under 42 U.S.C. § 1988; and

(m)      That this Court grant the requested injunctive relief without a condition of bond or other security being required of Plaintiff;

(n)      And such further relief that the Court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on each claim

asserted or hereafter asserted in the Complaint, and on each defense

asserted or hereafter asserted by the Defendants.

Respectfully submitted,

Dated: November 3, 2025

John F. Houton, Jr.
*Plaintiff, pro se*

## DECLARATION UNDER PENALTY OF PERJURY

I, John F. Houton, Jr., a citizen of the United States and a resident of the State of Massachusetts, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of November, 2025.

John F. Houton, Jr.