UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN HOUTON, | * | |
|  | * | |
| Plaintiff, | * | |
|  | * | |
| v. | * | |
|  | * | |
| MICHELLE WU; ADAM CEDERBAUM; ENEIDA TAVARES, *Commissioner of the Boston Election Department*; WILLIAM GALVIN, *Secretary of State, Commonwealth of Massachusetts*; ASHLEY GROFFENBERGER, *an individual*; COLLECTOR-TREASURER, CITY OF BOSTON; COMMONWEALTH OF MASSACHUSETTS; and JOHN DOES Nos. 1–10, *said names being unknown and fictitious, as unknown City of Boston Employees or Wu campaign officials*, | * | Civil Action No. 25-cv-13233-ADB |
|  | * | |
| Defendants. | * | |

# MEMORANDUM AND ORDER

BURROUGHS, D.J.

Before the Court is the Motion for Preliminary Injunction and Temporary Restraining Order, [ECF No. 4 ("Mot.")], filed by Plaintiff John Houton. For the reasons set forth below, the Motion is **DENIED**.[1]

---

[1] Pursuant to its discretion to "balance[e] between speed and practicality versus accuracy and fairness," Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st Cir. 1995) (quoting Jackson v. Fair, 846 F.2d 811, 819 (1st Cir. 1988)), the Court decides this Motion without an evidentiary hearing.

I.      BACKGROUND

   A.      Facts

Houton, an attorney employed by the City of Boston, has twice attempted to run for mayor of Boston, first in 2021, and again in 2025.  [ECF No. 1 ("Compl.") ¶¶ 9, 28, 88].  On both occasions, according to Houton, two obstacles held back his candidacy.  First, Houton alleges that his efforts were frustrated by the signature-gathering requirement imposed on mayoral candidates by Boston's city charter, which requires that candidates for mayor collect at least three thousand signatures within a 21-day period.[2]  [Id. ¶¶ 35, 99].  Second, he alleges that

---

[2] There is no single charter document for the City of Boston.  Rather, "[t]he city charter is a series of [s]tate statutes . . . ."  City Council of Boston v. Mayor of Boston, 421 N.E.2d 1202, 1204 (Mass. 1981).  The City of Boston publishes a single document containing "a selection of the most-often sought currently operative portions of the charter," but it cautions that the document "should not be considered a primary source of law."  Boston City Council, The Charter of the City of Boston (2007), https://codelibrary.amlegal.com/codes/boston/latest/boston_ma/0-0-0-18.

The rules for electing the mayor derive from chapter 452, section 55, of the 1948 Acts and Resolves of Massachusetts, which offered three options for Boston's form of government.  See generally 1948 Mass. Acts 403–32.  "At the biennial municipal election in 1949, the voters of Boston adopted Plan A."  City Council v. Mayor of Boston, 512 N.E.2d 510, 512 (Mass. App. Ct. 1987) (citing City Council v. City of Boston, 434 N.E.2d 1250, 1253 (Mass. 1982)).  Certain amendments, relevant here, occurred thereafter.  See 1983 Mass. Acts 582–86; 2004 Mass. Acts 1486–87.

The relevant provisions, as amended, may be summarized as follows.  Twenty-one weeks before the preliminary election, the election commission may begin issuing nomination petitions, and it must stop issuing petitions two weeks later.  1983 Mass. Acts 583; 2004 Mass. Acts 476.  During those two weeks, the commission must issue nomination petitions within two days after a candidate files a statement of candidacy.  1983 Mass. Acts 583.  Nomination petitions are due eighteen weeks before the preliminary election.  1983 Mass. Acts 587; 2004 Mass. Acts 1487.  By that time—twenty-one days after nomination petitions may begin to issue—candidates for mayor must submit a nomination petition signed by at least three thousand registered voters.  1983 Mass. Acts 586.

Defendant Wu and her allies stalled and ultimately disabled his candidacy by threatening his employment and conspiring with the press. [Id. ¶¶ 55–74, 81–99].

In 2021, Houton was employed as an Assistant Corporation Counsel for the City of Boston, working under Defendant Cederbaum. [Compl. ¶¶ 79–80]. On April 13, 2021, in a meeting that he had requested with Cederbaum, Houton disclosed that he planned to run for mayor and "would stay on the job while campaigning." [Id. ¶ 82]. Houton alleges that "Cederbaum avoided any detailed discussion about Houton's candidacy or his job status going forward[,] even when [Houton] asked if his job was secure." [Id.]. The two ran into each other again a few days later, and Houton raised the same topic. [Id. ¶ 83]. Houton concluded from that conversation that "his job was likely in jeopardy should he go forward as a candidate." [Id. ¶ 84]. Because of his concerns about his job security, [id. ¶ 85], Houton delayed taking further steps until April 22, 2021, when he phoned Henry Luthin, Corporation Counsel for the City, and received a similarly vague and noncommittal response, [id. ¶¶ 86–87]. Undaunted, Houton filed a candidacy statement on April 28, 2021, [id. ¶ 88], but ultimately did not secure the necessary signatures to appear on the ballot in 2021, which he blames on his delay in pursuing his candidacy due to the unsupportive responses of his supervisors, and the difficulty of attaining the number of required signatures within the time period specified by statute, [id. ¶ 99].

Houton points to several additional facts surrounding the 2021 election that show, he claims, concerted action by City officials to sabotage his candidacy. First, he notes that he corresponded over email with a Boston Globe reporter who told him that the Globe was planning to "nam[e] all the people who pulled papers for mayor and trying to give . . . readers a little information on each." [Compl. ¶ 90]. Although Houton responded to the request, [id. ¶ 91], the reporter never replied to him, [id. ¶ 92], and the "Boston Globe did not even mention [Houton] as

3

a candidate," [id.]. Houton alleges that "there was communication between City Hall personnel and the Boston Globe," [id. ¶ 93], that resulted in the suppression of his candidacy in favor of "those who [the media] wished to present as a candidate," [id. ¶ 92], namely, "Michelle Wu and all the other women candidates from the City Council," [id.]. Second, "to Plaintiff's great surprise," after winning the election, Mayor Wu named Houton's former supervisor, Adam Cederbaum, as her corporation counsel, calling him a "longtime friend and colleague." [Id. ¶ 101]. Houton claims that when Cederbaum was answering Houton's questions about running for office, Cederbaum "was in fact wearing two hats, one as Chief of Government Services in the Law Department and the other as an 'inside agent' at City Hall for candidate for mayor, Michelle Wu." [Id. ¶ 106]. Houton asserts that after Mayor Wu began in office, he experienced changes in his working conditions, including reassignment of his duties to nonlawyers, [id. ¶ 122], which he understood to be "retaliation against [Houton] for his 2021 candidacy," [id. ¶ 102].

Houton's 2025 attempt to run for office faced similar hurdles. He collected his nomination petition on May 5, 2025, which left him fifteen days to secure the required signatures before May 20, when his nomination papers were due. [Compl. ¶ 31]. After taking vacation leave between May 12 and May 20, working with "one other primary volunteer," [id. ¶ 55], he obtained 533 certified signatures before the deadline. [Id. ¶ 47]. Because he had not collected the required signatures, Houton was both "excluded from the election ballot" and "excluded from community forums for candidates." [Id. ¶ 49]. He also faced discipline at work. On May 9, Cederbaum informed Houton that he had learned about his candidacy from a news article and that Houton would be placed on paid administrative leave while outside counsel investigated the matter. [Id. ¶ 57]. Houton was, in effect, "suspen[ded] and remov[ed]" from his position on terms that were "unclear except that [he] was suspended (with paid leave) while the City

4

investigated [his] candidacy." [Id. ¶ 59]. This was despite the fact that City employees regularly run for offices besides mayor, including with support from Mayor Wu, see [id. ¶¶ 60–70], and that there also might have been a receptionist in City Hall who ran for mayor in 2025 without action being taken against him, [id. ¶ 149].

### B. Procedural History

On November 3, 2025, Houton filed the Complaint, [Compl.], raising constitutional claims under the First and Fourteenth Amendments, [id. ¶¶ 156–63, 164–93];[3] statutory claims under 42 U.S.C. § 1983, [id. ¶¶ 194–204, 236–39, 242–55], 18 U.S.C. § 1962(d), [id. ¶¶ 205–35], and Mass. Gen. Laws ch. 149, § 185, [id. ¶ 240]; state common law, [id. ¶ 241]; and equity, [id. ¶¶ 256–60].[4]

On November 10, 2025, he filed the instant Motion, [Mot.], seeking (1) a declaratory judgment that the signature-gathering and timing restrictions imposed on mayoral candidates are unlawful under the Constitution and the Massachusetts Declaration of Rights, (2) a declaratory judgment that the 2025 preliminary and general mayoral elections were unlawful, (3) a new special election for mayor overseen by a federal election monitor, (4) an injunction against the City of Boston taking "further adverse employment actions or injurious actions of any kind" against Houton, and (5) an injunction against any further interference by Defendants with

---

[3] Houton also makes reference to the Massachusetts Declaration of Rights, see [Compl. ¶¶ 157, 158, 196, 198, 229], but he does not plead a state constitutional cause of action.

[4] The Complaint names the following defendants: the Commonwealth of Massachusetts; the City of Boston; Mayor Wu; Adam Cederbaum; William Galvin, Massachusetts' Secretary of State; Ashley Groffenberger, Collector-Treasurer of the City of Boston; and ten unknown City of Boston employees or Wu campaign officials. It also refers to individuals not named as defendants, including Jerica Bradley, Margaret Dyson, and Maureen Garceau. [Compl. ¶¶ 15–17]. The Court notes that it cannot exercise personal jurisdiction over a person if he or she is not named in the Complaint or has not received service of process.

Houton's "right to engage in constitutionally protected activity in Boston, Massachusetts." [Mot. at 3]. Defendant opposed the motion on November 24, 2025, [ECF No. 12 ("Opp'n")].

## II.     LEGAL STANDARD

Preliminary injunctions function to "preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). The granting of a preliminary injunction is "an 'extraordinary and drastic remedy' . . . that 'is never awarded as of right.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)). "In determining whether to grant a preliminary injunction, [a] district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Tech., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)). Likelihood of success on the merits is the factor that "weighs most heavily in the . . . analysis," CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 55 (1st Cir. 2020) (citing Ross-Simons, 102 F.3d at 16), but even where likelihood of success on the merits is established, a party must "show that [he] ha[s] inadequate remedies at law," Does 1-6 v. Mills, 16 F.4th 20, 36 (1st Cir. 2021) (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1019 (1984)), before a Court can grant a preliminary injunction.

## III.    ANALYSIS

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

Houton's somewhat intertwined claims may be separated into two general categories.[5] First, Houton challenges the constitutionality of the signature-gathering requirements imposed on candidates for mayor of the City of Boston by Massachusetts law. Second, he challenges various defendants' treatment of him as a prospective candidate both in 2021 and 2025. The Court considers each of these claims in turn.[6]

### A.   Constitutionality of Signature-Gathering Requirements

Houton is unlikely to succeed on the merits of his constitutional challenge to the signature-gathering requirements, which he argues violate the First and Fourteenth Amendments. See [Compl. ¶¶ 158, 163–69]. "The impact of candidate eligibility requirements on voters implicates basic constitutional rights," Anderson v. Celebrezze, 460 U.S. 780, 786 (1983); see also id. at 786 n.7 (noting that the First Amendment and the Fourteenth Amendment's Due Process and Equal Protection clauses may all be implicated by election-law challenges), but "[a]lthough these rights of voters are fundamental, not all restrictions . . . on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates," id. at 788.[7] To determine which restrictions are unconstitutional,

---

[5] As an attorney, Houton "is not a typical pro se litigant, [but] the Court will, in an abundance of caution, afford him some leeway." Kersey v. Staples, No. 17-cv-11267, 2017 WL 6566095, at *2 (D. Mass. Dec. 21, 2017) (citing In re Osborne, No. 13-cv-08211, 2014 WL 2738558, at *2 n.5 (S.D.N.Y. June 17, 2014), aff'd, 594 Fed. Appx. 34 (2d Cir. 2015)).

[6] In the interest of resolving Houton's emergency motion, the Court will analyze Houton's likelihood of success on the merits assuming that he has named a proper defendant as to each claim. The Court notes, however, that Houton's complaint is not sufficiently specific as to which claims are asserted against which defendants.

[7] Though the plaintiffs in Anderson included three voters, as well as a candidate, see Anderson, 460 U.S. at 783, candidate plaintiffs have standing to challenge ballot access restrictions even when they are not joined by a voter plaintiff, see, e.g., Swanson v. Worley, 490 F.3d 894, 896–99, 902–03 (11th Cir. 2007); Buscemi v. Bell, 964 F.3d 252, 261–62 (4th Cir. 2020) (considering candidate plaintiffs' challenge to signature requirements and filing deadline after dismissing

courts apply "the sliding scale approach announced by the Supreme Court in Anderson[, 460 U.S. at 789–90], and Burdick v. Takushi, 504 U.S. 428, 434 (1992)." Libertarian Party of New Hampshire v. Gardner, 638 F.3d 6, 14 (1st Cir. 2011) (first citing Barr v. Galvin, 626 F.3d 99, 109 (1st Cir. 2010); and then citing Werme v. Merrill, 84 F.3d 479, 483 (1st Cir. 1996)).  Under this approach, courts weigh "the burdens, if any, placed on a plaintiff's constitutionally protected rights" against "the precise interests put forward by the state as justifications for the burdens." Id. (citing Werme, 84 F.3d at 483).  If the restrictions are "[r]easonable" and "nondiscriminatory," they "need be justified only by legitimate regulatory interests," whereas if "the burden imposed by a ballot access regulation is heavy, the provision must be narrowly tailored to promote a compelling state interest."  Barr, 626 F.3d at 109.

    The ballot restrictions at issue here are nondiscriminatory.  Houton argues otherwise, contending that the signature-gathering requirements for mayor of Boston must be discriminatory because they differ from the requirements imposed on candidates for mayor in other Massachusetts cities.  See [Compl. ¶¶ 159, 169, 199].  This argument is unavailing because each city's mayorship is a distinct office, and only the requirements for each distinct office must be nondiscriminatory.  Where candidates for the same office are all subject to the same requirements, those requirements are not discriminatory within the meaning of the Anderson-Burdick inquiry.  Cf. Barr, 626 F.3d at 109 ("The . . . ballot access provisions at issue here are nondiscriminatory.  They do not specifically differentiate among . . . candidates [on the basis of their affiliation] . . . with any . . . political organization.  In other words, all political

---

voter plaintiff for lack of standing); see also Bullock v. Carter, 405 U.S. 134, 143 (1972) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation . . . .").

organizations are subject to the same criteria . . . ."). Because all candidates for mayor of Boston must satisfy the same requirements, those requirements, including the signature-gathering requirements, are nondiscriminatory.

The burden imposed by the relevant requirements is also likely to be reasonable. It may be true that, as Houton alleges, few candidates have the means to "corral" supporters who will collect signatures for them, and that without such support few candidates will secure the necessary number of signatures, [Compl. ¶ 37], but Boston's requirements are far less burdensome than other signature-gathering requirements that have been upheld as constitutional. In Jenness v. Fortson, 403 U.S. 431 (1970), the Supreme Court upheld a Georgia law requiring candidates who had not won a major-party nomination to submit nomination petitions "signed by at least 5% of the number of registered voters at the last general election for the office in question," id. at 432, despite the fact that the Georgia threshold was "somewhat higher than the percentage of support required to be shown in many States as a condition for ballot position," id. at 442. More recently, the Seventh Circuit heard a challenge to a law requiring candidates for mayor of Chicago to present nominating petitions signed by 12,500 eligible voters, or approximately 1% percent of all eligible voters, within 90 days. See Stone v. Bd. of Election Comm'rs, 750 F.3d 678, 680 (7th Cir. 2014). The panel concluded that the "signature requirement is not a severe burden" and upheld it as constitutional. Id. at 683.

The signature-gathering requirements at issue in this case are less burdensome than those examples. Boston's rules require the signatures of roughly 0.82 percent of eligible voters, slightly less than the share required in Stone and far less than the share required in Jenness. Houton places great emphasis on the fact that, in order to satisfy the signature-gathering requirements, an aspiring candidate must be able to gather roughly two hundred signatures each

9

day.  See [Compl. ¶¶ 31–32].  The number of signatures required is not unreasonable, given that requiring signatures serves the "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a . . . candidate on the ballot," Jenness, 403 U.S. at 442, so as to "avoid[] ballot overcrowding and prevent[] voter confusion," Stone, 750 F.3d at 685.  The ability to turn out supporters to sign a nominating petition is a reasonable metric for assessing preliminary support.

Because the signature-gathering requirements are nondiscriminatory and seemingly reasonable in light of state interests in regulating elections, Houton is unlikely to succeed on his constitutional challenge.

### B.    Alleged Actions Taken Against Houton

Houton next challenges his suspension and other treatment in the workplace, claiming that he was retaliated against for protected First Amendment activity, [Compl. ¶¶ 157, 172, 177–80, 195, 198, 223, 237, 242], and deprived of employment in which he had a property interest, in violation of the Due Process Clause of the Fourteenth Amendment, [id. ¶¶ 172, 202].  Houton is unlikely to prevail on his due process claim for the simple reason that, beyond a general assertion that "as a public employee, [he] has a . . . protected property interest in . . . continued employment," [id. ¶ 202], Houton has not alleged that he could only be dismissed for cause or otherwise pleaded any facts to establish that "he ha[d] a reasonable expectation, arising out of a statute, policy, rule, or contract, that he w[ould] continue to be employed."  Senra v. Town of Smithfield, 715 F.3d 34, 38 (1st Cir. 2013) (emphasis added) (quoting Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 101 (1st Cir. 2002)); see also Dasey v. Anderson, 304 F.3d 148, 156–57 (1st Cir. 2002) ("An employee who can only be dismissed for cause has such an expectation.  An at-will employee, however, has no reasonable expectation of continued

employment." (quoting King v. Town of Hanover, 116 F.3d 965, 969 (1st Cir. 1997))).  The Court thus focuses on his First Amendment claim.

The record before the Court, which does not clearly establish what reasons were given by Defendants for the alleged adverse employment actions taken against Houton,[8] suggests that Houton's First Amendment claim is essentially a "patronage dismissal" or "political dismissal" claim.  Because "political loyalty of [certain] employees" is necessary to ensure "that representative government not be undercut by tactics obstructing the implementation of . . . policies presumably sanctioned by the electorate," Elrod v. Burns, 427 U.S. 347, 367 (1976), the First Amendment permits dismissal of people in "policymaking positions," id. at 372, as well as other roles in which political loyalty "is an appropriate requirement for the effective performance of the public office involved," Branti v. Finkel, 445 U.S. 507, 518 (1980).  In the First Circuit, courts have regularly upheld dismissals for political reasons of any "employee[] . . . significantly connected to policy-making," including employees who "merely represent[] [an] agency's policy positions to other entities or to the public."  Flynn v. City of Boston, 140 F.3d 42, 45 (1st Cir. 1998) (citing Cordero v. De Jesus-Mendez, 867 F.2d 1, 11–12, 14 (1st Cir. 1989)).  Houton's position as the Assistant Corporation Counsel in the City of Boston's Treasury Department, see [Compl. ¶ 9]; [ECF No. 12-6], was one of apparent seniority and policymaking responsibility.  See [Compl. ¶ 148 (disputing characterization of Houton's position as that of a "junior and inexperienced attorney")].  He was required to undertake various discretionary decisions on behalf of, and provide counsel to, the City of Boston's Treasury Department.  See [ECF No. 12-5

---

[8] Houton states that Cederbaum told him that his candidacy raised concerns about Houton's ability to "serve our client," meaning the City of Boston, and gave him a letter restating the same reason.  [Compl. ¶ 57].  That letter has not been entered into the record.

at 3]. Accordingly, Houton has not shown a likelihood that his dismissal is improper under the Elrod-Branti line of cases, as applied in this Circuit. As such, the Court concludes that Houton is not entitled to the "extraordinary and drastic remedy" of a preliminary injunction on his First Amendment claim. Voice of the Arab World, 645 F.3d at 32 (quoting Munaf, 553 U.S. at 689–90).

### C.    Remaining Claims

Houton raises a variety of other claims. His claims of defamation, [Compl. ¶ 197], and tortious interference, [id. ¶ 241], do not entitle him to a preliminary injunction because he possesses an adequate remedy at law. See Together Emps. v. Mass General Brigham Inc., 19 F.4th 1, 7–8 (1st Cir. 2022) ("Because adequate legal remedies foreclose injunctive relief, the appellants cannot demonstrate irreparable harm without showing that they have inadequate remedies at law.").

As to each of his other claims, Houton has not pleaded sufficient facts for the Court to consider whether he is likely to succeed on the merits. Houton raises a First Amendment challenge to a City of Boston policy, [Compl. ¶¶ 181–93], but he has not provided the text of the challenged policy or an explanation of what it requires. He further alleges that Defendants violated Mass. Gen. Laws ch. 149 § 185, [Compl. ¶ 240], but the facts pleaded do not show that prior to the alleged retaliatory actions in this case, Houton had "[d]isclose[d], or threaten[ed] to disclose . . . an activity, policy or practice . . . that [Houton] reasonably believe[d] was [unlawful]," Mass. Gen. Laws ch. 149 § 185(b)(1), or engaged in other activity protected by the statute, see id. § 185(b)(2)(3). Finally, he alleges that "Boston City Hall is an organization engaging in crime, unlawful acts, deception, and fraud" within the scope of the RICO Act, 18 U.S.C. § 1962(c), [Compl. ¶¶ 198, 205–35], but he has not pleaded adequate facts to satisfy the

various elements required by 18 U.S.C. § 1962(c).  Accordingly, the Court cannot conclude that Houton is likely to prevail on these claims, and it further notes that if he were likely to prevail, he would need to show that his remedies at law for these claims were inadequate before the Court could award a preliminary injunction on that basis.

## IV.     CONCLUSION

For the reasons stated above, Houton's motion for a preliminary injunction and preliminary declaratory relief is **DENIED**.

**SO ORDERED.**

January 2, 2026                                                                 */s/ Allison D. Burroughs*
                                                                                                ALLISON D. BURROUGHS
                                                                                                U.S. DISTRICT JUDGE