UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. <u>25-13233</u>

JOHN HOUTON

          Plaintiff

v.

MICHELLE WU, ADAM CEDERBAUM, , CITY OF BOSTON, and JOHN DOES Nos. 1-10, Said Names Being Unknown and Fictitious, as Unknown City of Boston Employees or Wu Campaign Officials

          Defendants

**FIRST AMENDED COMPLAINT**

Plaintiff John Houton, pursuant to 42 U.S.C. § 1983, brings this action against Defendants Michelle Wu, Adam Cederbaum and the City of Boston and John Does for violating Plaintiff's First Amendment rights and seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief.

**JURISDICTION AND VENUE**

1.    The Court has jurisdiction of this lawsuit under 28 U.S.C. §§ 1331 and 1343(a)(3).

2.    Venue is proper under 28 U.S.C. § 1391(b)(2).

**PARTIES**

3.    Plaintiff John Houton is an individual and resident of Boston, Massachusetts.

4.    Defendant Michelle Wu or  referred to herein as "Mayor Wu" or "Michelle Wu" is sued in both her personal, individual capacity and in her official capacity as Mayor of the City

1

of Boston.

5.      At all relevant times, Defendant Adam Cederbaum or otherwise referred to as "Cederbaum" is sued in his official capacity as Corporation Counsel of the City of Boston Law Department, and also personally in his individual capacity.

## STATEMENT OF FACTS

6.      On April 5, 2021, a city-wide email communication was sent to all city employees from Henry Luthin, Corporation Counsel:

Colleagues:

"In anticipation of the upcoming political season for municipal offices, please remember that no City employee should be participating in any campaign activity during regular business hours and you are subject to the political activity prohibitions any time you are at work (even if remote). Our first and only priority is to provide the best service possible to residents of the City of Boston."

7.      The policy in fact appropriately informs, guides, and warns employees that political activity shall only be engaged outside of the workplace. The policy mostly pronounces a "prohibition on political activity during business hours" and "applies to any use of personal social media and email accounts for campaign purposes." It further states that "No public resources may be used for campaign purposes."

8.      Within the text of his email Luthin writes that "If you are at work, you should not be engaged in any form of political activity."

9.      In addition, the policy states the following:

"City employees are prohibited by statute from fundraising for a candidate at any time, whether at work or during non-working hours. Specifically, City employees may not solicit campaign donations, accept money on behalf of a candidate, or assist in any campaign fundraising. City employees are not, however, prohibited from donating to a candidate or attending a fundraising event."

10.     At the end of his email notification, Corporation Counsel Luthin wrote the

2

following:

11.    "If you have any questions, please contact Chief of Government Services Adam Cederbaum..."

12.    On April 12, 2021, in accordance with Luthin's email direction, Houton emailed Cederbaum requesting a meeting. Houton was acting in full compliance with the written policy and direction by Corporation Counsel.

13.    On April 13, 2021 Houton met with his Law Department supervisor Adam Cederbaum to discuss the open mayoral election and his desire to pursue political office.

14.    Houton stated he wanted to run for the office of mayor, and that he relied on the City's political activity policy and guidance provided by Caroline Driscoll that all "city employees" may run for "any office" and would not be subject to "termination."

15.    In this meeting, Houton sought guidance from Cederbaum, his supervisor, on how to proceed should he run and what job related responsibilities and issues need to be resolved in doing so.

16.    Houton stated that he wished to remain on the job while being a candidate.

17.    Cederbaum did not provide any guidance to Houton even after Houton stated Driscoll advised him that all city employees could run for any office without concern or fear of termination.

18.    Houton experienced confusion and anguish since his supervisor acted without guidance or direction. Unexpectedly, Cederbaum did not provide any clear response or guidance on the city's political activity policy for employees or propose a meeting to discuss the matter further at the Law Department. Houton delayed filing his candidacy while he assessed his meetings with Cederbaum which appeared in direct conflict with the guidance he received from Driscoll.

19.    Days passed while Houton struggled with, and delayed, his decision without

further guidance. Finally, on April 22, 2021 Houton called Henry Luthin, Corporation Counsel, in order to obtain a Law Department response and appropriate guidance. Houton spoke with Luthin explaining his desire to run for mayor and that the opportunity seemed right as it was an open mayoral election. Luthin did not direct or guide Houton in any direction. Afterwards Houton followed up and emailed Corporation Counsel Luthin the guidance he received previously from Caroline Driscoll, which Houton had relied on. Houton had relied on Driscoll's clearly expressed written guidance in her email correspondence with Houton. Houton filed his statement of candidacy for mayor at the Boston Election Department on or about April 28, 2021.

20.     Houton did not appear on the preliminary election ballot in September 2021. City Councilors Michelle Wu and Anis Essabi-George were the top two candidates receiving votes and advanced to the general election for mayor in November 2021.

21.     On November 2nd, 2021 City Councilor and mayoral candidate Michelle Wu won the general election for mayor of Boston.

22.     On November 18, 2021, and to Plaintiff's great surprise, Mayor elect Wu appointed Adam Cederbaum to serve as her Corporation Counsel. Suddenly, Corporation Counsel Luthin (to whom Houton called for guidance on April 22nd) was a subordinate to Cederbaum, who was merely a supervisor in the Law Department. Henry Luthin was retained and appointed senior counsel and remained in the Law Department until his retirement in May 2023. In her statement announcing to the public appointing Adam Cederbaum Wu stated: "I'm grateful to appoint this longtime friend and colleague…as our next Corporation Counsel."

23.     Houton was denied promotions and other job opportunities for which he was qualified in 2022 and again in 2024. He sought Cederbaum's support and assistance in applying for such jobs which was ignored by Cederbaum. Houton applied for the 2nd Assistant Collector-Treasurer and subsequently the First Assistant Collector-Treasurer in the Treasury Department. The interview and hiring process overseen by the Collector-Treasurer, Ashely Groffenberger,

Maureen was a sham process in which Houton experienced retaliation because of his exercising his constitutional rights in 2021. Houton subsequently experienced diminution of duties in his counsel position in the Treasury.

24.    In May of 2025 Houton again observed other city employees running for political office just as occurred in 2023 and in 2021. Houton believed that based on his knowledge and experience in city government he too could contribute as well as any other employee or non-city-employee to the political process.  Compelling evidence to Houton at the time was another city employee from the Elderly Commission was running for mayor which further encouraged Houton and was consistent with Caroline Driscoll's guidance that she earlier provided to Houton.

25.    Houton felt secure that the availability of political opportunity was auspicious and he had full expectation of continued employment going forward regardless of the outcome of the elections in 2025.

26.    Boston City Hall had already been a cauldron of political activity where city employees were regularly planning and running for political office and the Wu administration had facilitated and participated in such activity and campaigns. Several employees who became candidates for political office actually held policymaking positions at levels several degrees above Houton's  position which is not policymaking.

27.    Houton's position as an attorney in the Treasury Department was, although "confidential",  one in which he primarily provided legal advice and counsel on municipal finance matters, a narrow technical area of expertise with very little, if any, discretionary authority.

28.    Another city attorney who worked at the Boston Water and Sewer Commission also ran for political office as an At-Large City Councilor. In contrast to the adverse employment action taken against Houton (suspension and subsequent discharge), Will Onuoha, a long time

city hall employee who was promoted from a position at City Hall to an Associate General Counsel attorney position at the Boston Water and Sewer Commission, was permitted to run for the City Council. The mayor exercises influence and control over the BWSC through her appointment authority of the BWSC's three commissioners. Onuoha ran for one of four At-Large City Councilor seats on the Boston City Council. Before becoming mayor, Michelle Wu was an At-Large City Councilor.

29.    Alexandra Valdez was also a candidate for an At-Large City Council seat on the Boston City Council. Ms. Valdez served as Michelle Wu's Director of Boston's Office of Cultural Affairs. Ms. Valdez was not suspended or terminated from city employment.  She continues to be employed by the City of Boston.

30.    Responding to a reporter's question about what makes Valdez stand out from other candidates in the race for City Council, Ms. Valdez stated the following:

31.    "What makes me stand out is my lived experience and my deep understanding of how Boston works because I lived it, and I've helped make it work better for our communities. I bring a fresh perspective as a mother, an immigrant, and a public servant with over ten years of experience at City Hall. I've had the privilege of serving under three mayoral administrations, leading departments, managing budgets, and creating programs that have reached thousands of Bostonians cross every neighborhood."

32.    See Boston.com: "Boston City Council at-large Race: Alexandra Valdez, by Madison Lucchesi and Ross Cristantiello, October 31, 2025

33.    Ms. Valdez, a Director of the Office of Cultural Affairs at the City of Boston, is a policymaker. Valdez, despite being a public employee and having served three mayoral administrations, serving the Wu administration as a policymaker, was under city policy enabled to run for political office seeking an At-Large City Councilor seat on the Boston City Council. Valdez was advanced and not suspended or terminated in contrast to Houton who was suspended

immediately, just two days after an article appeared with his statements speaking on matters of public concern in Boston.

34.    Onuoha, Valdez, and other similarly situated employees, ran for political office in 2025, 2023, and earlier with no prohibitions in the city's political activity policy or any other notification to city employees. The city's political activity policy did not single out classes of employees who held policymaking positions, including attorneys (as "trusted advisors"),  who would be subject to adverse employment action because of political affiliation or speech. Such information would have been informative if stated in the policy or otherwise expressed by Driscoll, Cederbaum, or Luthin to whom Houton sought guidance related to the policy.

35.    In fact, Mayor Wu herself has encouraged other City employees to run for office as recently as the last election in 2023 for City Council, including John FitzGerald, at the time was an employee of the Planning and Development Agency, who succeeded and currently represents District 3 on the City Council and will be running unopposed in the general election in November 2025.

36.    Enrique Pepén, was Executive Director of the City's Department of Neighborhood Services, who also was a candidate supported by Mayor Wu in 2023. He is currently a City Councilor running for reelection for District 5 on the Boston City Council.

37.    Both Pepen and Fitzgerald, candidates for re-election in this cycle, are former city employees who ran for office and, unlike city employee Houton, were not punished and stymied by the Wu administration. Quite the opposite, they received the encouragement and support of the mayor.

38.    In addition, and even more confusing, the Mayor is currently supporting the candidacy of another City employee in this 2025 election cycle for the City Council. Alexandra Valdez, Mayor Wu's executive director of Boston's Office of Cultural Affairs, is a candidate on the ballot running for city councilor at-large for the Boston City Council.

39.     Mayor Wu has supported another executive level employee running for City Council, Henry Santana, in 2023. He "served as the inaugural director for Mayor Michelle Wu's Office of Civic Organizing" according to the City Council page on Boston.gov and received the help and support of the Mayor and was elected in 2023.

40.     Startlingly, in the spring of 2025, it appeared incumbent Councilor Santana was having difficulty obtaining signatures to get on the ballot for this September's election, according to the stellar reporting of the Boston Herald's Gayla Cawley. (See ¶67 below).

41.     Councilor Santana, who was facing the same time deadline as Candidate Houton was trying to meet as a mayoral candidate, benefited from the cavalry call made by Mayor Wu to her supporters.

42.     In fact, Mayor Wu used her political infrastructure, upon information and belief, including city resources, to get the call out to the public by news publications as well as an email list to her supporters. As a candidate for At-Large City Councilor, Santana needed a total of 1500 signatures, as opposed to Candidate Houton's 3,000, by May 20th. It was Friday May 17, 2025 and the mayor's handpicked preferred candidate from 2023 was in danger of not getting on the ballot in Boston in 2025, his first reelection opportunity.

43.     The Herald's Cawley reported:

44.     "Boston Mayor Michelle Wu is mobilizing her campaign in an 'all hands on deck' effort to get Henry Santana, one of her preferred City Council candidates, on the ballot ahead of Tuesday's deadline." Cawley further noted that Santana was the only at-large incumbent to have not completed his signature forms."

45.     The article is titled: "Boston Mayor Wu launches campaign effort to get her preferred city councilor on ballot" and a photo appears below the title with Wu and Santana smiling and laughing apparently on July 20, 2023 in front of a crowd of supporters holding Henry Santana signs. Below the photo a caption states, among other things, that "the Mayor and

several city councilors and union endorse Henry Santana for City Councilor at Large…"

46.     With the deadline to file nomination papers "fast approaching, Mayor Wu is described as "launching" or galvanizing her supporters to get engaged to help Henry Santana get on the ballot again.

(See attached Article by Gayla Cawley, Boston Herald, May 17, 2025)

47.     For some unstated reason each time such candidates had freedom to run but Houton was singled out when he exercised his First Amendment rights of association and speech. Houton was thwarted and stymied beginning in 2021 and suspended and terminated on January 16, 2026. Other employees were allowed to freely run for office just as Caroline Driscoll expressly stated Houton could under the policy. However, Houton, similarly situated, following Driscoll's guidance, suffered suspension and termination. The City's actions clearly treated Houton differently from other employees notwithstanding that Houton had a reasonable expectation of continued employment based on the political activity policy, his reliance on the Law Department guidance provided by Driscoll, and the abdication of any responsibility from Houton's other supervisors, Cederbaum and Luthin.

48.     When Houton sought guidance from Driscoll, Cederbaum, and Luthin none of these senior management Law Department officials discussed Mass. R. Prof. C. 1.7(a)(2) with Houton in any context not the least being the political activity policy. In fact, Houton was in full compliance with Rule 1.7 by reviewing the policy and seeking guidance and direction from Driscoll, Cederbaum, and Luthin. By doing so Houton was reconciled with his duty of loyalty under the rule and with the administration's priorities and absolutely no conflict existed with Houton's duties in the Treasury Department. No discussion or questions associated with such potential conflict was ever raised by the Law Department which was fully aware of Houton's interest in political activity.

49.     There is demonstrably zero impact on city operations from Houton's candidacy.

No employee relationships were impacted. No employees were even aware of Houton's candidacy. The sole impact that did occur was the removal of Houton from his job which directly impacted and disrupted Treasury operations and services by removing an experienced municipal finance attorney.

50.    With several employees running for political office at City Hall during recent election cycles there is no evidence of direct disruption nor any potential disruption of employment relationships and the workplace. Such political activity has demonstrably not affected or impacted the City of Boston's ability to provide services to the public efficiently and effectively.

51.    Indeed, especially during the Wu administration, City of Boston employees appear accustomed to seeing other city hall employees running for office in 2023 and 2025. If there was any real concern about such disruptions, new prohibitions would be reflected in modifications to the City's political activity policy yet the Wu administration did not do so. The City's political activity policy over the past several elections provides no such warnings or prohibitions to employees regarding the potential for political activity disruption of employment relationships and the workplace. The policy's main thrust is unchanged and simply prohibits political activity in the workplace while employees have been permitted to continue to seek political office in the City of Boston.

52.    It is noteworthy what is not included in the policy. The policy does not express any ongoing concern about employees running for office or that such candidacies adversely affect the job performance and rights of fellow employees. The policy does not address or otherwise treat the subject of employees' political activity speaking on matters of public concern outside of the workplace and certainly does not single out and warn any particular category of employees or employee classifications that they are at risk should they speak on matters of public concern or associate with candidates or affiliate with people who do not agree with

Michelle Wu. Thus, Houton, having sought appropriate guidance from his Law Department leadership, felt assurance of his continued employment even while engaging in his contemplated political activity outside of the workplace. When Houton met with Cederbaum seeking his guidance in accordance with Luthin's directive referencing Cederbaum, he was not aware of Cederbaum's association with candidate for mayor Michelle Wu and that he was her longtime friend nor that Cederbaum was in line to be Wu's Corporation Counsel should she win election. When Houton met with Cederbaum or spoke with Luthin for guidance neither official raised Rule 1.7 with Houton. Each official chose to abdicate their duty to a subordinate attorney under their managerial responsibility. Having sought their guidance negates any Rule 1.7 conflict of interest basis of an adverse employment action against Houton. In fact, by going to them Houton complied with Rule 1.7.

53.    The City's political activity policy speaks for itself and its officials have presumably made appropriate determinations over the years in balancing the interests of employees and the government's ability to provide services without disruption of employee relationships at the workplace. The Wu administration had not materially altered any balancing of interests reflected in the policy leading up to the municipal election season when it suspended Houton on May 9, 2025 for political activity including for his statements on matters of public concern and that he became a candidate for mayor of Boston.

54.    Since the city policy clearly permitted employees participating as candidates and expressed no prohibitions against employees running for office, successive administrations have acknowledged, encouraged, and acquiesced to the undeniable fact that employees have been permitted to run for office for years at City Hall interference or adverse employment actions. That ended on May 9, 2025 when Cederbaum and Wu suspended and removed Houton from his employment at the City where he has worked for nearly 20 years.

55.    In addition, there is no indication or evidence of the City by policy or otherwise

11

communicating to employees that the government's ability to provide services to the public efficiently and effectively has been, or would be, impacted or disrupted by employees running for political office. The current and past policies of the City have not been modified and revised to explicitly and categorically inform employees of their inclusion or exclusion on a list of employees occupying positions prohibited from running as a candidate for any specified office. The city has not informed employees by department or position that they hold a job classification which is prohibited from running for political office in Boston while employed by the City of Boston.

56. Houton, himself, was never informed that his position was excluded even when he communicated to his Law Department superiors that he desired to run for mayor in the open mayoral election of 2021 and sought their guidance and direction.

57. Corporation Counsel Henry Luthin did not communicate any objections or provide guidance other than sending the political activity reminder by email to Houton and all other city employees.

58. Adam Cederbaum did not communicate any objections or provide supervisory guidance when he served as Chief of Government Services in the Law Department nor when he served as Corporation Counsel once appointed by Mayor Michelle Wu.

59. Caroline Driscoll, the designated official responsible for providing guidance, expressed clear guidance which was that any employee could run for any City of Boston elected offices.

60. Houton relied on the City's political activity policy in 2017, 2021 and 2025 and he relied on Driscoll's guidance in relation to his participation in political activity as an employee in becoming a candidate for mayor of the City of Boston.

61. On Friday May 2, 2025 Houton filed his statement of candidacy for mayor.

62. Subsequent to his filing Houton was interviewed by a reporter from The

12

CommonWealth Beacon. Houton was quoted as saying: "Boston needs new leadership, desperately." Houton was also quoted as saying, "If we've got the target on our back, as it appears with the [Trump] administration, we shouldn't be provoking the president. We should be working with the president. Even Tip O'Neil in his heyday had a great relationship with Ronald Reagan,"... "We're going to be losing so much federal support." Houton aalso stated "You're asking if ICE comes to the city, if a Houton administration would cooperate with federal authorities? Absolutely," Houton said.

63. On May 9, 2025, two days after the CommonWealth Beacon article was published, Houton was suspended by Corporation Counsel, Adam Cederbaum because he was running as a candidate for mayor.

64. Houton relied on the City's political activity policy in 2017, 2021 and 2025 to understand his responsibility as a city employee and in relation to his potential political activity as a candidate for mayor of the City of Boston.

65. Houton did not obtain the requisite number of signatures in order to get on the preliminary election ballot for September 9, 2025.

66. Subsequently, on January 16, 2026, more than two months after the November 4, 2025 general election in which Mayor Wu was running unopposed and won, the City of Boston terminated him from his employment.

67. Mr. Houton is not a policy maker.

68. The political activity policy says nothing about policymaking employees or employees who operate in confidence and what prohibitions regarding political activity apply to such positions.

69. Houton had relied on the policy and the express guidance provided by Caroline Driscoll, the designated official referenced in the published 2017 policy, that "all employees" may run for "any office" and would not be subject to "termination."

13

70.    The political activity policy did not draw a dividing line separating those employees who could lawfully be barred from running from those who could not.

71.    Neither Cederbaum nor Luthin informed Houton that he was a policymaker or that he was not permitted to run for any category of office in the City including mayor. Houton believed he complied with the city's 2017 and 2021 political activity policy consistent with Driscoll's guidance.

72.    As shown above, Houton had informed Cederbaum and Luthin of Driscoll's guidance and that it was the basis upon which he was considering running for political office intending to be a candidate for mayor. Neither Cederbaum, Luthin, nor any other city official advised Houton differently or that Houton should not follow Driscoll's guidance. If Cederbaum and Luthin did contact Driscoll and discussed her correspondence with Houton there was never any follow-up with Houton from any of them to alter, modify, or clarify the advice that Driscoll provided Houton. Nor did any of them directly contact Houton to expressly reject Driscoll's guidance in April 2021 or anytime thereafter before Cederbaum suspended Houton on May 9, 2025.

73.    Houton's meetings and communcations with Cederbaum and Luthin constituted actual notice to the City that Houton was engaging in protected constitutional activity as a result of the guidance he received from Driscoll in accordance with the City's political activity policy. If the City claims the advice given to Houton by Driscoll was in error and that it omitted vital information which would have altered Houton's understanding that his job title placed him in a classification separate from all other employees so that he would be unable to practically run for the office of mayor then the City would have had actual notice in April 2021 that Driscoll provided inadequate guidance that was likely to result in violations of employees' constitutional rights including Houton's.

74.    In April 2021 Houton had spoken with Cederbaum and Luthin about Driscoll's

guidance on which Houton had relied for compliance with the City's political activity policy. Houton forwarded Driscoll's guidance to Corporation Counsel Luthin promptly after his phone conversation with Luthin on April 22, 2021. The City thus had opportunity to correct Driscoll's previous guidance if Houton was misguided by Driscoll. In fact, Houton's April 2021 understanding was never altered or corrected by Luthin or Cederbaum or any other Law Department or City official in or after April 2021. Neither Luthin or Cederbaum clarified or warned Houton despite his direct inquiries.

75.    The City's political activity policy continued to remain in effect as did Houton's understanding in accordance with Driscoll's guidance. Houton asserts that evidence in the possession of the City, communications between city officials including individual defendants will establish Cederbaum, Luthin, Wu and others agreed among themselves to provide misleading guidance, maintain silence when questioned, and ultimately retaliate against Houton for his political activity in a conspiracy to interfere with Houton's civil rights (42 U.S.C.A. § 1985(3)) . The city and its officials permitted Houton to rely on his understanding that he may run for political office regardless of his position. It was reasonable for Houton to rely on Driscoll's guidance. Houton had a reasonable expectation that his employment would continue regardless of the result of his political activity consistent with the policy and guidance he obtained. Indeed, his employment continued after his April 2021 candidacy without suspension or termination. Houton therefore could and did reasonably expect his employment would continue when he filed his May 2, 2025 statement of candidacy in the Boston Election Department. Houton was surprised that he was suspended on May 9, 2025. Houton was later terminated from employment on January 16, 2026 approximately 2 ½ months after Michelle Wu's reelection as mayor in which she ran unopposed.

76.    What is essential but yet unknown to Plaintiff are the communications between Wu, Luthin, Cederbaum, Driscoll and any other City officials during and after April 2021

15

regarding Houton's understanding of the City's political activity policy and his interest in, or pursuit of, becoming a candidate for mayor of Boston. The fact that Luthin failed to supervise or train Cederbaum and Driscoll and thereby correct any potential misguidance given to Houton demonstrates that the City's officials disregarded a known and obvious consequence of the City's political activity policy which entices any employee to seek to exercise his or her First Amendment rights of free speech, expression and association. However, the policy does not inform employees that several or many may suffer adverse employment consequences as their vested employment positions may be terminated if they follow the policy and decide to run for office.

77.    Also unknown to Plaintiff are the communications between former Mayor Kim Janey, Luthin, Cederbaum and any other city officials during and after April 2021 regarding Houton's understanding of the City's political activity policy and his interest in, or pursuit of, becoming a candidate for mayor of Boston. Wu was merely a city councilor and not privy to communications between corporation counsel or other law department officials as she was a member of the legislative branch of the City of Boston. Luthin and Cederbaum as managers in the Law Department had duties owed to the acting mayor and the public interest, and not particularly to candidate for mayor City Councilor Wu. Such duties outlined in Mass. R. Prof. C. 1.7, in part, govern the conduct and responsibility of both Luthin and Cederbaum and Houton at the City during this period. However, Houton acted consistent with Rule 1.7 and went to his managers Corporation Counsel Luthin and Chief of Government Services Adam Cederbaum who was named as the designated official on the political activity policy that Luthin distributed citywide.

78.    Such communications, or lack of such communication, about Houton will reveal much to Plaintiff's case in chief as to the meaning and purpose of both Cederbaum's and Luthin's actions or omissions regarding Houton's seeking guidance from Law Department

officials related to the City's political activity policy and his exercise of his First Amendment rights and those of other city employee candidates during the same period.

79.     Corporation Counsel Cederbaum, Luthin's long-time subordinate and then his successor once Wu was elected, suspended Houton from his job in the Treasury Department because he was running for mayor of Boston. The city later terminated Houton from employment on January 16, 2026 approximately 2 ½ months after Michelle Wu's reelection as mayor in which she ran unopposed.

80.     Houton's filing of statements of candidacy in 2021 and 2025 were a direct result of the guidance he received from Driscoll whom he reasonably relied on as the designated Law Department official authorized to advise employees on political activity. Such advice was rendered directly to Houton by Driscoll in May 2017 and intended to guide Houton in understanding employees' obligations in order to be in compliance with the City of Boston's political activity policy applicable to all employees.

81.     Cederbaum and Luthin knew Houton relied upon Driscoll's guidance yet their actions, and omissions, in dealing with Houton constitute a failure to supervise and therefore acted with deliberate indifference to Houton's First Amendment rights of free speech and free association when Cederbaum and the Wu administration discriminated, and retaliated, against Houton by:

82.     denying him promotions when he applied for the 2nd Assistant Collector-Treasurer position in 2022 and the First Assistant Collector-Treasurer position in 2024;

83.     ignoring and denying Houton for consideration of the General Counsel position at the Boston Water and Sewer Commission in 2024.

84.     The City of Boston and Michelle Wu and Adam Cederbaum discriminated against Houton in suspending him from his job in the Treasury and terminating Houton from his employment on January 16, 2025 when other city employees ran for office with no consequence

17

while the City did not establish any system of notice for which employees can properly understand how the policy may apply to their job classification.

85.    As a result of their deliberate indifference Houton's suspension and termination resulted in the loss of employment, income, insurance and retirement and were caused by a continuing unconstitutional government policy attributed to the Law Department officials responsible for its development and implementation.

86.    As a result of Wu's, Cederbaum's and Luthin's deliberate indifference Houton suffered the deprivation of his First Amendment rights in April 2021 when Cederbaum thwarted and stymied Houton's opportunity to file his statement of candidacy earlier than he did and lost time and opportunity to advance to earnestly get on the ballot as a candidate for mayor in 2021; if Houton was in violation of city policy or his job was in jeopardy that is the time Luthin and Cederbaum, his supervisor, should have alerted him. Ultimately, Houton suffered suspension on May 9, 2025 and termination from employment on January 16, 2026 as a result of their indifference. Houton's suspension and termination and loss of employment and benefits and resulting consequential damages were, and continue to be, caused by a continuing unconstitutional government policy, i.e., that political activity policy, attributed to the Law Department officials responsible for its development and implementation and on which Houton reasonably relied.

87.    If Driscoll's guidance about the policy was in error and Cederbaum and Luthin allowed Houton to be guided by it, their misconduct instilled reliance by Houton and the City's subsequent adverse employment actions must be estopped because of such misconduct; they were deliberately indifferent to the consequences for Houton's continued employment and nearly two decade career at the City. Cederbaum and Luthin had actual notice that Houton relied on Driscoll's guidance, and that due process violations were likely to result absent better training and supervision. Nonetheless, they allowed Houton to rely on the guidance and he acted

consistent with it. The result was an unconstitutional trap set by the city in violation of Houton's fundamental First Amendment, equal protection, and due process rights. The City was on actual notice in April 2021 that such a vital and particular omission (not alerting employees in certain positions that they would be subject to adverse employment action for running for office) in their training on political activity policy implementation would cause violations of employees' or Houton's, constitutional rights.

88.     Cederbaum and Luthin were acting under color of law as officials in the City of Boston Law Department and supervised Plaintiff and Driscoll. Cederbaum and Luthin failed to supervise and train Driscoll in her implementation of the policy through the guidance she provided to employees including Houton. If she had proper training and supervision, the Driscoll's guidance would have informed Houton about certain job classifications were subject to adverse employment actions for participating in political activity.

89.     Houton believed he was following the city's policy correctly and acting consistent with what Caroline Driscoll expressly advised Houton, that all employees may run for any office and would not be subject to adverse employment action including termination. If Driscoll's advice about the policy was incorrect and Houton followed such advice, Luthin and Cederbaum had an opportunity to reject or otherwise explain that Houton's job position was classified in a different category. Neither Cederbaum or Houton informed Houton Driscoll's guidance was incorrect.

90.     Luthin and Cederbaum should have informed Houton that he could not reasonably be a candidate. If they had, Houton would not have run for office and he would not have experienced the deprivation of his First Amendment rights or the loss of his position at the city and suffered consequential damages.

91.     However, Luthin and Cederbaum disregarded the known and obvious consequences of their and the City's misconduct. Their actions suggest that they either failed to

supervise Driscoll and correct any faulty advice or guidance given to Houton, or they willfully disregarded and allowed the consequences to happen and through their indifference or by purpose set a trap to entice Houton to exercise his First Amendment rights so they could deem him a "policymaker" and "trusted adviser" subject to political affiliation/patronage dismissal.

92.     Houton's actions were reasonable because 1) Houton followed Driscoll's advice, and 2) notified Cederbaum pursuant to the policy, and 3) spoke with Luthin and forwarded Driscoll's guidance to him, in order to 4) reconcile any inconsistency between their guidance on the political activity policy and Driscoll's. In doing all this Houton's purpose was to pursue his First Amendment rights like other employees while being compliant with the City's political activity policy and his professional responsibility and, most importantly, remain in his job. Those were the reasons why Houton had contacted and relied upon each Law Department official: 1) Driscoll; 2) Cederbaum; 3) Luthin.

93.     Houton is not a policymaker though he is a trusted advisor in the Treasury Department. Notwithstanding his job description, Houton was originally hired by the Treasury Department having left the Law Department (where he served for four years) in 2011 for this non Law Department position. Houton was hired by the First Assistant Collector-Treasurer, Vivian Leo in 2011.

94.     The City in an unrelated and pending adjudicatory proceeding at the Massachusetts Commission Against Discrimination, the City's position statement had denied Houton managed legal affairs for the Treasury Department. Rather, the City stated: "Complainant does not manage Treasury' s legal affairs. His position provides advice and counsel on legal matters in Treasury." Thus, the City clearly does not see Houton as a policymaker. Houton has done just what the city states. He exclusively provides advice and counsel on legal (public finance) matters in the Treasury Department. Houton has never been in a position to provide policy guidance. The substance of the duties inherent in the position

pertains to compliance on municipal finance matters that arise in the Treasury. The overall functions of the Treasury Department do not involve decision making on issues where there is room for political disagreement on goals or their implementation.

95.    The particular responsibilities of Houton's position within Treasury do not resemble those of a policymaker or other such position whose function is such that party affiliation is an equally appropriate requirement for continued employment. That far more describes Cederbaum and Luthin's positions and other Law Department officials located three floors up from the Treasury Department in City Hall. Houton simply never engaged in policy or politically animated decision making in the Treasury nor did he provide legal advice and counsel to the heads of the department on such policy or political judgment ever in Treasury. Houton was in Treasury because of his technical expertise and not because of political service or affiliation. Any decision making or counsel provided by Houton was legal guidance on municipal finance law governing Treasury's operations and functions. Such matters relating to policy occur elsewhere at City Hall, perhaps in the Law Department, but certainly not in the Treasury Department. Former heads of the Department can attest to the same. Treasury is and has always been a department focused on municipal finance functions and operations. Period.

96.    Houton had no power to supervise or control others in Treasury; he was merely a legal advisor on municipal finance issues in connection with the Treasury function. There was no public perception of Houton's position other than speaking to taxpayers about their delinquent tax accounts, wage garnishments, bankruptcy cases, etc. Houton had no influence on programs and no direct contact with elected officials and had no need or opportunity to be responsive to partisan politics and political leaders in his 15 years in the Treasury Department spanning four administrations. Moreover, Houton's counsel and advice, his inherent responsibilities in the Treasury Department had no bearing on partisan goals and policies. The Treasury's function required Houton's counsel and advice strictly on compliance with law as

Treasury carried out or executed its municipal finance functions.

97.    Neither Cederbaum nor Luthin informed Houton of any inconsistency or conflict in Law Department policy or guidance regarding Houton's position as an attorney in the Treasury under the policy despite Houton's direct requests and contact. No Law Department official or other City official notified Houton that the City deemed certain employees, including Houton, a policymaker because of their job description and that under the policy certain employees would be subject to suspension and dismissal for running for public office. Nor was Houton informed by policy or otherwise that he would be suspended and dismissed for speaking on matters of public concern and being a candidate for mayor even though other employees running for office could speak on matters of public concern and not be subject to adverse employment action. In fact, Cederbaum had opportunity over four years to have a supervisory conversation with Houton to discuss this subject, the entire time of his tenure as Corporation Counsel. However, only after Houton filed his statement of candidacy on May 2, 2025 and a news article appeared in which Houton spoke on matters of public concern as a candidate for mayor did Cederbaum request a meeting with Houton at which Cederbaum suspended Houton for his political activity on May 9, 2025. In contrast, Houton was not suspended after filing his statement of candidacy in April 2021.

98.    In the meeting of May 9, 2025 Cederbaum claimed "surprise and disappointment that I learned in a news article, not from you, that you are or will be a candidate for Mayor." Cederbaum suspended Houton and provided a letter to notify Houton for the "reasons we discussed at the meeting." Among other things the letter stated that Houton's suspension will give Cederbaum "the opportunity to gather additional information, seek outside expert guidance, and consider how to meet the Law Department's obligations in this unique situation."

99.    At the meeting Houton was stunned he was being suspended and explained that other employees were running for office and at least one was running for mayor. Cederbaum

acknowledged the individual running for mayor and stated something to the effect that such employee was different. He did not explain further other than an investigation will follow regarding Houton's candidacy.

100.    After the meeting Houton wondered why Cederbaum and Luthin didn't call Houton to a  follow up meeting in April 2021 to discuss the same subject when he sought their guidance essentially and if necessary "to gather additional information, seek outside expert guidance" so the Law Department and Houton "could meet their obligations."

101.    Indeed, Houton's understanding and actions under the policy were entirely based on Driscoll's guidance under the policy. Houton's 2021 communications with Cederbaum and Luthin regarding the policy incorporated Driscoll's guidance as an essential component for consideration. Cederbaum and Luthin ratified Driscoll's guidance in 2021 by their silence and inaction. Corporation Counsel Luthin evidently chose not to act or reject Houton's understanding of the policy based on Driscoll's guidance. No action was taken after Houton filed his statement of candidacy on April 28, 2021. Evidently, they felt no need to discuss Driscoll's guidance or the political activity policy with Houton or to inform him of the "uniqueness" of the situation that Cederbaum noted in the May 9, 2025 suspension letter. This matter may have been unique early in April 2021, but it was a matter of consequence brought to the attention of the Law Department by Houton during the 2021 election cycle. The fact that Cederbaum waited until May 9, 2025 to break Houton's reliance on Driscoll's guidance reflects a violation of the duty he owed to Houton since their first meeting in April 2021 when Cederbaum was as the Law Department's Chief of Government Services and Houton's supervisor. The Law Department and the City were on notice in 2021 that Houton was seeking to exercise his first amendment rights under the political activity policy. Cederbaum heard it from Houton with his own ears. Why did Cederbaum do nothing for four years and then act surprised and suspend Houton in May 2025? The reason they did not act as they should have in

23

their official positions with the Law Department is because they were acting in concert to keep a conspiracy hidden. damaging to Cederbaum, Luthin, Wu and the City of Boston. They operated in a conspiracy with themselves and with others still unknown.

102.    The Cederbaum-Wu conspiracy also caused Houton great injury to his person, his career, the loss of his job and the deprivation of his First and Fourteenth Amendment rights under the U.S. Constitution and the Massachusetts Constitution. Houton alleges there are others involved in this conspiracy of silence.

103.    Houton met with Cederbaum, his supervisor, and spoke with Luthin, Corporation Counsel, seeking guidance. Cederbaum lied in the May 9, 2025 meeting and stated a falsehood in the letter justifying adverse employment action against Houton. Cederbaum feigned surprise about Houton's candidacy and needed the opportunity to review the matter. He had the opportunity to review the matter in April 2021 but did not perhaps because he hid a financial interest in the outcome of the election because he was associated with candidate Michelle Wu and expected to be named Corporation Counsel should she win the election.

104.    If so, why didn't the Law Department act then? exceptional status of his job which would preclude him from political candidacy at the City of Boston. Therefore, Houton has established a reasonable expectation of continued employment.

105.    Though Houton was an at-will employee, his reasonable expectation of continued employment

106.    Since his dismissal Houton has suffered from loss of his employment including income and benefits at the City and is seeking compensatory and consequential damages for lost pay and benefits, loss of income and future earnings and benefits that would have accrued through continued employment and promotions and is seeking punitive damages as just and appropriate under law for the willful violation of Houton's fundamental rights under the U.S. constitution, the Massachusetts constitution and applicable statutes.

24

107.    Houton had worked for the City of Boston for nearly 20 years and was a vested employee in both health insurance benefits and pension systems of the City of Boston.

**COUNTS I and II**
(42 U.S.C. § 1983 – Retaliation for Protected Speech;
Political Discrimination)

108.    Plaintiff realleges paragraphs 1-24 as if fully stated herein.

109.    Plaintiff enjoys the right to Freedom of Speech as protected by the First Amendment to the United States Constitution.

110.    At all relevant times, Plaintiff was engaged in constitutionally protected speech when he filed his statement of candidacy on May 2, 2025 and previously on or about April 28, 2021; plaintiff was engaged in constitutionally protected speech when he was interviewed by a reporter of the CommonWealth Beacon and quoted in its online publication on or about May 7, 2025. Plaintiff was interviewed as a candidate by the Boston Herald and the Boston Globe which published articles about Houton's candidacy to get on the ballot for the preliminary election of September 9, 2025. His candidacy and his statements were undertaken in his capacity as a citizen and candidate not as an attorney for the City of Boston Treasury Department.

111.    Defendants, acting under color of Massachusetts law, deprived Plaintiff of his rights under the First Amendment to the United States Constitution when they suspended and later terminated Plaintiff for exercising his right to Freedom of Speech.

112.    Defendants' firing of Plaintiff constitutes an adverse employment action.

113.    Plaintiff's interest in speaking out as a citizen and candidate about matters of public concern outweighs any interest Defendants may have had in promoting the efficiency of the municipal and other governmental services that the City of Boston provides.

114.    Plaintiff's protected speech was a substantial or motivating factor in Defendants'

decision to terminate his employment, and but for Plaintiff's protected speech, he would not have been discharged.

115. Plaintiff suffered loss of earning, emotional distress, loss of reputation, and harassment as a direct and proximate result of Defendants' violation of his constitutional rights.

## COUNT III

## (42 U.S.C. §§ 1961, 1962, 1964 – RICO Violation)

116. Plaintiffs repeat and re-allege each and every allegation made in the paragraphs above and incorporate same herein as if fully set forth.

117. At all times relevant to this complaint, all of the defendants operate as an entity structured as an association in fact operating within and without the City of Boston municipal government under their control. At all times relevant to this complaint, all of the defendants were and are an association in fact enterprises as defined by 18 U.S.C. §1961(4) that are and were engaged in, and whose activities affect, interstate and foreign commerce. Their common purpose and function was and is to gain control of the City of Boston government, eliminate opposition such as Houton's candidacy represented, but also other opposition in Boston, as it were, for example, the North End Chamber of Commerce and its restaurant associated businesses subject to fraud and concealment in relation to outdoor dining in the North End, and Massachusetts land owners who were lied to and obstructed by the enterprise from discovering facts through public records inquiries about political campaign contributions and associations with entities that benefit from city policies such as rent control and land acquisition for affordable housing ultimate for the purpose of profit of such individuals from the marketing, distribution, promotion, advertising and/or sale of affordable housing in Boston. Upon information and belief, in addition to defendants' legitimate activities, however, they were used in a pattern of racketeering activity in violation of 18 U.S.C. §1962(a), (b), (c), (d).

118.    The defendants herein are "persons" pursuant to 18 U.S.C. §1961(3). The patterns of racketeering activity engaged in by the defendants involved separate but related schemes, carried out during the spring of 2021, possibly fall of 2020 when Wu announced her candidacy for mayor, in April 2021 when Houton met with Cederbaum and communicated with Luthin to the present, and directed at Plaintiff and other individuals in violation of 18 U.S.C. §1961(1) and §1962:

a)    Inducing Houton to delay his filing of a statement of candidacy for mayor in April 2021, denying Houton guidance on his role and responsibility under the City's political activity policy as his supervisor; denying Houton and the city of Honest Services consistent with his fiduciary duty to his subordinate and to the City, his employer;

b)    Misrepresenting material facts about his association with Michelle Wu and her campaign, in that he was not her friend when in fact he was a longtime friend and supporter of Michelle Wu, a candidate for mayor in the election Houton was seeking professional guidance regarding his interest and his position;

c)    Misrepresenting himself as Houton's supervisor in April 2021 when he was wearing two hats: one for the City and a hidden hat for Michelle Wu who was not his employer but had promised something of value to Cederbaum, the job of Corporation Counsel;

d)    Purposefully failing to disclose material facts including his relationship with Michelle Wu and his financial interest in the outcome of the election while failing to supervisor and provide guidance to his subordinate;

e)    Suspending Houton from his job because he had filed his candidacy for mayor and spoke on matters of public concern which appeared in various news articles; suspending Houton for reasons which Cederbaum had a duty to disclose or inform Houton about in April 2021 but intentionally withheld such guidance.

f)    Concealing the true relationship that he had with Michelle Wu and Luthin and unknown others in order to avoid inquiry into the legality of same.

119.    The The pattern of racketeering activity engaged in by the defendants named herein involved fraudulent acts in support of the above schemes and constituted mail and wire fraud (18U.S.C. §1341 and §1343), and bribery (18 U.S.C. §201; M.G.L. 268A, §2) all of which is "racketeering activity," as defined in 18 U.S.C. §1961(1).

120.    On information and belief, Defendants Wu and Cederbaum, and others unknown, engaged in, supported, condoned, or facilitated acts of bribery or quid pro quo exchanges and transactions to secure loyalty, suppress dissent, and shield individuals within the administration from exposure;

121.    The above described are numerous predicate acts of mail fraud, wire fraud, and bribery which defrauded Plaintiff to his right for honest services. The predicate acts include mail and emails, texts or calls containing misrepresentations or omissions made in furtherance of the schemes, derived from specified unlawful activity. Houton herein relied upon the misrepresentations and omissions directed at Plaintiff herein by the defendants as part of their pattern of racketeering activity, and as a result suffered monetary and business damages.

122.     patterns of racketeering activity engaged in by the defendants involved separate but related schemes, carried out during the spring of 2021, possibly fall of 2020 when Wu announced her candidacy for mayor, in April 2021 when Houton met with Cederbaum and communicated with Luthin to the present, and directed at Plaintiff and other individuals in violation of 18 U.S.C. §1961(1) and §1962:

## COUNT IV

### Fraudulent Inducement

123.    Plaintiffs repeat and reallege each and every allegation above and incorporate

same herein.

124.    This Cause of Action is asserted against Defendants for actual, compensatory and punitive damages based upon common law fraud and/or fraud in the inducement.

125.    The conduct referred to above constitutes intentional misrepresentations, concealments and/or omissions of fact by Defedants through media and websites and directly in conversations.

126.    The material misstatements, concealments and/or omissions as to the City's political activity policy when Houton sought guidance from his Law Department superiors are all material inducements to Plaintiff's reliance and on Driscoll's guidance which led him to be suspended and terminated from his nearly two decades of public services and use of same, were made with full knowledge of their falsity and/or with reckless disregard of the truth.

127.    On information and belief, Defendants intended that the Plaintiff rely upon the aforementioned misrepresentations, concealments and/or omissions to induce him to delay or otherwise not interfere with their scheme for the 2021 election.

128.    Plaintiff reasonably relied on Defendants' intentional misrepresentations, concealments or omissions inducing him delay and ultimately forgo his political activity in 2021 as it became futile.

129.    Plaintiff reasonably relied on Defendants' intentional misrepresentations, concealments or omissions inducing him to make the effort to run for office in 2025 relying on the Driscoll guidance and the acuiesence that occurred in 2021 when no adverse employment consequences were known by policy or notification by the City or Cederbaum as other employees entered the political fray.

130.    As a result of the aforementioned conduct of Defendants Wu and Cederbaum, Plaintiff was injured for which he is entitled to recover actual, compensatory and punitive damages.

131. On information and belief, the above-mentioned acts were committed by Defendants City of Boston, Wu, Cederbaum, and others as yet unknown, willfully, wantonly and with reckless disregard of the rights of the Plaintiff.

## COUNT V

### Municipal Liability Under (42 U.S.C. § 1983)

### Defendant City of Boston – MONELL CLAIM

132. Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth herein.

133. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

134. The aforementioned customs, policies, usages, practices, procedures and rules of the City of Boston included, but were not limited to, suppressing speech of a public employee engaged in First Amendment activity through harassment and retaliation, committing violations of the conflict of interest law of the Commonwealth of Massachusetts, and honest services fraud, mail fraud, wire fraud, in practices so persistent and widespread that they constituted acts of policymakers. In addition, as detailed throughout this complaint, individual policymakers directly participated in and/or tacitly condoned the retaliation which Plaintiff was subjected to. Individual policymakers within the City of Boston participated in such actions and failed to halt this retaliatory activity or discipline those engaged in such activity.

135. The foregoing customs, policies, usages, practices, procedures and rules of the

City of Boston constituted deliberate indifference to the constitutional rights of Plaintiff.

136.    The foregoing customs, policies, usages, practices, procedures and rules of the City of Boston were the direct and proximate cause of the constitutional violations suffered by the Plaintiff.

137.    The foregoing customs, policies, usages, practices, procedures and rules of the City of Boston were the moving force behind the constitutional violations suffered by Plaintiff.

138.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of Boston, Plaintiff was subjected to harassment, demoted, and constructively fired.

139.    As a result of the foregoing, Plaintiff is entitled to compensatory and economic damages in an amount to be fixed by a jury and is further entitled to punitive damages against the individually named Defendants in an amount to be fixed by a jury, plus reasonable attorney's fees, costs, and disbursements associated with this action.

## COUNT VI

### SUBSTANTIVE DUE PROCESS (42 U.S.C. § 1983)

140.    Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth herein.

141.    The Defendants City of Boston, Wu, and Cederbaum, and John Does 1-10, Jane Does 1-5, in their official capacities, acting under color of law, are liable to the Plaintiff for subjecting Plaintiff to conduct that violated Plaintiff's right to substantive due process

of law guaranteed by the Fourteenth Amendment to the United States Constitution, enforceable by 42 U.S.C. § 1983.

142.     The conduct of the Defendants herein, collectively and individually, was extreme and outrageous and cause Plaintiff to be deprived of his property right to employment by retaliating against Plaintiff since 2021 election including isolation in his workplace, reassigning his duties to other employees, going around Plaintiff and obtaining legal advice routinely from the Law Department directly when such was the routine duties of Plaintiff in his job, harassing Plaintiff and lying to plaintiff in meetings when feigning one purpose of the meeting for the provision of his good counsel yet creating false imperatives in order to create a trap and pretext to undermine Plaintiff in his work for the purpose of retaliation and removing Plaintiff, and retaliating against Plaintiff and conspiring to alienate and eventually remove Plaintiff from his employment;

143.     Plaintiff did not receive proper notice of his suspension and constructive termination as Assistant Corporation Counsel.

144.     The above-described violation of Plaintiff's right to due process of law committed by Defendants City of Boston, Wu, and Cederbaum, as well as John Does unknown as of the time of the filing of this Complaint violated Plaintiff's right to due process of law guaranteed by the Fourteenth Amendment of the United States Constitution, enforceable through 42 U.S.C. § 1983 and was the direct, proximate cause of Plaintiff's damages.

**COUNT VII**

**Violation of Fourteenth Amendment to the U.S. Constitution, Procedural Due Process**

**Pursuant to 42 U.S.C. § 1983**

145.     Plaintiff Houton repeats and realleges all prior paragraphs as if fully set forth

herein.

146.    The Fourteenth Amendment to the U.S. Constitution prohibits states, and their political subdivisions, from depriving "any person of life, liberty, or property, without due process of law."

147.    Plaintiff, as a public employee, has a legitimate claim of entitlement to, and protected property interest in, continued employment with his tenure as a nearly 20-year employee, dedicated in public service as counsel in the City of Boston, when he was arbitrarily and capriciously suspended from his job because he exercised his First Amendment right to pursue elected office in Boston.

148.    Other similarly situated employees of the City of Boston also exercised their First Amendment rights to seek office and were not removed from their job.

149.    On May 9, 2025, the Cederbaum, and the City, acted under color of state law to deprive Plaintiff of his property interest without due process of law in violation of his procedural due process rights under the Fourteenth Amendment. On January 16, 2026 the City of Boston terminated Houton's employment from the City.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment against Defendants, jointly and severally, orders Defendants to pay compensatory, consequential, and punitive damages to Plaintiff, awards Plaintiff reasonable attorneys' fees and costs, and grants Plaintiff all other such relief that the Court deems just and proper.

* * *

**PLAINTIFF DEMANDS A JURY TRIAL**

Dated:  February 23, 2026                          Respectfully submitted,

33

/s/ John F Houton
John F Houton
143 West Brookline St. #406
Boston, MA 02118
Tel: (617) 529-1992

*Pro Se Plaintiff*

## DECLARATION UNDER PENALTY OF PERJURY

I, John F. Houton, Jr., a citizen of the United States and a resident of the State of Massachusetts, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of  February, 2026.

/s/John F. Houton, Jr.
John F. Houton, Jr.